1
2
3
4
5
6
7
8
9

**UNITED STATES DISTRICT COURT**

10

**SOUTHERN DISTRICT OF CALIFORNIA**

11

ARTHUR G. TORRES,

Civil No.        09-2130 IEG (WVG)

12

Petitioner,

13

vs.

**REPORT AND RECOMMENDATION RE DENYING PETITION FOR WRIT OF HABEAS CORPUS**

14

DERYL G. ADAMS, Warden,

15

Respondent.

16

17  **I.       INTRODUCTION**

18          Arthur G. Torres, a state prisoner proceeding pro se, has filed a Petition for Writ of Habeas

19  Corpus pursuant to 28 U.S.C. § 2254 challenging his San Diego County Superior Court conviction

20  in case number SCD 179259.  Torres was convicted by jury of numerous gang-related felonies and

21  sentenced to 26 years to life.  (Lodgment No. 1, Clerk's Transcript ("CT"), vol. 1 at 67-87.)  Torres

22  claims his federal constitutional rights were violated for the following reasons:  (1)  the prosecutor

23  improperly excused African-Americans from the jury, in violation of his Sixth and Fourteenth

24  Amendment rights; (2) constitutionally insufficient evidence supported his conviction on Count 4 of

25  the indictment (conspiracy to furnish a firearm to a felon); and (3) the trial court improperly

26  instructed the jury on accomplice testimony in violation of his Fourteenth Amendment right to due

27  process.  (Pet. at 6-8 and Attachment A, Torres' Petition for Review to the California Supreme

28  Court, at 1-11.)

The Court has considered the Petition, Respondent's Answer and Memorandum of Points and Authorities in Support of the Answer, the Lodgments submitted by Respondent, and all the supporting documents submitted by the parties.  Based upon the documents and evidence presented in this case, and for the reasons set forth below, the Court recommends that the Petition be **DENIED**.

## II.   FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct. Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  28 U.S.C.A. § 2254(e)(1)(West 2006); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness).  The introductory facts as found by the state appellate court are as follows:

> [¶] In 2003, the authorities placed a wiretap on Torres's phone to obtain evidence about a methamphetamine distribution operation run by the Mexican Mafia. The Mexican Mafia is a Hispanic gang operating in California's prisons. The gang's methamphetamine distribution operation extends to the outside community. In the outside community, the gang designates crew leaders who manage the methamphetamine distribution operation. The crew leaders and crew members may belong to different gangs, and are not necessarily persons who have been accepted into the Mexican Mafia. The crew leaders are also charged with the responsibility of collecting debts owed to drug dealers who are under the Mexican Mafia umbrella and of "taxing" methamphetamine dealers who are allowed to operate in areas controlled by the Mexican Mafia. The taxation requires the dealers to provide the crew leader with money, which is then transmitted to Mexican Mafia members in prison and their family members.

> [¶] Torres and Contreras are members of the Old Town National City gang, and Gongora is a member of the Del Sol gang. The prosecution presented evidence that Torres was a crew leader for the Mexican Mafia, running a methamphetamine distribution operation from June through December 2003. Torres worked under Mexican Mafia members Jose Marquez and Robert Marin, who he referred to as "the Señors ." Contreras and Gongora were identified as crew members working for Torres.

> [*3] [¶] Victims Sanchez and Bush were also methamphetamine dealers. The extortion-related conduct committed by Torres and Contreras against Sanchez occurred because Sanchez owed money to another methamphetamine dealer who Torres was protecting. The robbery-related offenses committed by defendants against victim Bush occurred as part of taxation activity directed at Bush. The conspiracy to kidnap Jauregui committed by Torres and Gongora arose because Torres believed Jauregui had arranged for Torres to be killed.

> [¶] Much of the evidence against defendants was derived from the wiretaps on Torres's phone, as well as from the testimony of several methamphetamine dealers

1   who agreed to testify on behalf of the prosecution. We will present more facts
2   concerning the offenses in our discussion of the various issues raised by the
    defendants.

3   (Opinion[1]/ at *2-3.)

4   **III.    PROCEDURAL BACKGROUND**

5       On September 21, 2005, the San Diego County District Attorney's Office charged Arthur

6   Torres in an Amended Consolidated Information/Indictment with conspiracy to distribute

7   methamphetamine with ten (10) overt acts for the benefit of a criminal street gang, with a prior

8   conviction, in violation of California Penal Code ("Penal Code") section 182(a)(1), California

9   Health and Safety Code ("H&S Code") section 11379, and Penal Code sections 186.22(b)(1) and

10  11370.2(a) [Count 1]; kidnaping for robbery for the benefit of a criminal street gang (Penal Code §§

11  209(b)(1) & 186.22(b)(1)) [Count 2]; assault upon a person by means likely to produce great bodily

12  injury for the benefit of a criminal street gang (Penal Code §§ 245(b)(1) & 186.22(b)(1)) [Count 3];

13  extortion for the benefit of a criminal street gang (Penal Code §§ 520 & 186.22(b)(1)) [Count 4];

14  robbery for the benefit of a criminal street gang (Penal Code §§ 211 & 186.22(b)(1)) [Count 5];

15  conspiracy to commit extortion with 18 overt acts for the benefit of a criminal street gang (Penal

16  Code §§ 182(a)(1), 518, 520 & 186.22(b)(1)) [Count 6]; attempted murder for the benefit of a

17  criminal street gang (Penal Code §§ 187(a), 664 & 186.22(b)(1)) [Count 7]; conspiracy to commit

18  robbery, with ten (10) overt acts, for the benefit of a criminal street gang (Penal Code §§ 182(a)(1),

19  211, 213(a)(1)(A) & 186.22(b)(1)) [Count 8]; first degree robbery in concert as a principal with at

20  least one principal personally using a firearm for the benefit of a criminal street gang  (Penal Code

21  §§ 211, 213(a)(1)(A), 12022.53(b), (e)(1) & 186.22(b)(1)) [Count 9]; conspiracy to commit assault

22  by means likely to produce great bodily injury, with four (4) overt acts alleged, for the benefit of a

23  criminal street gang (Penal Code §§ 182(a)(1), 245(a)(1) & 186.22(b)(1)) [Count 10]; assault by

24  means likely to produce great bodily injury for the benefit of a criminal street gang (Penal Code §§

25  245(a)(1), 186.22(b)(1)) [Count 11]; battery with serious bodily injury for the benefit of a criminal

26

27      [1]The unpublished opinion of the California Court of Appeal pertaining to Torres' case was
    lodged by the Attorney General's Office as Lodgment No. 12.  Because the copy of Lodgment No. 12
28  submitted contains only the odd-numbered pages and omits the even-numbered pages of the opinion,
    the Court cites to the Westlaw version of the opinion found at 2008 WL 2381772 (Cal.App. 4 Dist.) and
    refers to the opinion in the body of this report and recommendation as "Opinion."

street gang (Penal Code §§ 243(d) & 186.22(b)(1)) [Count 12]; conspiracy to commit assault by means likely to produce great bodily injury, with four (4) overt acts alleged, for the benefit of a criminal street gang (Penal Code §§ 182(a)(1), 245(a)(1) & 186.22(b)(1) [Count 13]; conspiracy to furnish a firearm to a prohibited person, with three (3) overt acts alleged, for the benefit of a criminal street gang (Penal Code §§ 182(a)(1), 12072 & 186.22(b)(1)) [Count 14]; conspiracy to kidnap, with four (4) overt acts alleged, for the benefit of a criminal street gang (Penal Code §§ 182(a)(1), 207(a) & 186.22(b)(1)) [Count 15]; and conspiracy to commit assault by means likely to produce great bodily injury, with six (6) overt acts alleged (Penal Code §§ 182(a)(1) & 245(a)(1)) [Count 16].  (1 CT 67-87.)[2]

Following a jury trial, Torres was found guilty on all counts except Count 7, which was dismissed.  (3 CT 547-83.)  The trial court sentenced Torres to 26 years to life in prison.  (6 CT 1148-1152.05, 7 CT 1450-1452.)  Torres then pled guilty to conspiracy to commit an assault as a lesser included offense of conspiracy to commit assault by means likely to produce great bodily injury.  He was given a one-year concurrent sentence. (6 CT 1155-1157.)

Torres and his co-defendants appealed their convictions to the California Court of Appeal for the Fourth Appellate District, Division One.  (Lodgment Nos. 2-4.)  The state appellate court affirmed the judgment against Torres in an unpublished opinion filed June 13, 2008.  (Lodgment No. 12.)[3]  Torres and his co-defendants then filed petitions for review in the California Supreme Court, which that court denied "without prejudice to any relief to which defendants might be entitled after the United States Supreme Court decides *Oregon v. Ice*, No. 07-901."  (Lodgment Nos. 13-16.)  Torres filed a habeas petition pursuant to 28 U.S.C. § 2254 in this Court on September 29, 2009 [doc. no. 1].  Respondent filed an Answer and a Memorandum of Points and Authorities in Support of the Answer to the Petition on February 26, 2010 [doc. no. 6].  Torres did not file a Traverse.

//

//

---

[2]Torres was tried along with two co-defendants named in the Amended Consolidated information /indictment, Francisco Gerardo Gongora and Julio Contreras.  (*See* 1 CT 67-87.)

[3]The Court of Appeal affirmed the judgment of the trial court as to co-defendant Gongora and affirmed the judgment as modified as to co-defendant Contreras.  (Lodgment No. 12.)

1 //

2 **IV.**     **DISCUSSION**

3     **A.     Scope of Review**

4     Title 28, United States Code, § 2254(a) sets forth the following scope of review for federal

5 habeas corpus claims:

6         The Supreme Court, a Justice thereof, a circuit judge, or a district court shall
        entertain an application for a writ of habeas corpus in behalf of a person in custody
7        pursuant to the judgment of a State court only on the ground that he is in custody in
        <u>violation of the Constitution or laws or treaties of the United States.</u>

8

9 28 U.S.C. § 2254(a) (West 2006) (emphasis added).  As amended, 28 U.S.C. § 2254(d) reads:

10         (d) An application for a writ of habeas corpus on behalf of a person in custody
        pursuant to the judgment of a State court shall not be granted with respect to any

11

12     claim that was <u>adjudicated on the merits</u> in State court proceedings unless the
    adjudication of the claim –

13

14             (1) resulted in a decision that was contrary to, or involved an
        unreasonable application of, clearly established Federal law, as
        determined by the Supreme Court of the United States; or

15             (2) resulted in a decision that was based on an unreasonable
        determination of the facts in light of the evidence presented in the

16        State court proceeding.

17 28 U.S.C. § 2254(d)(1)-(2) (West 2006) (emphasis added).

18     "[The Anti Terrorism and Effective Death Penalty Act] establishes a 'highly deferential

19 standard for evaluating state-court rulings, which demands that state-court decisions be given the

20 benefit of the doubt.'"  *Womack v. Del Papa*, 497 F.3d 998, 1001 (9th Cir. 2007) (quoting *Woodford*

21 *v. Viscotti*, 537 U.S. 19, 24 (2002)).  To obtain federal habeas relief, Torres must satisfy either

22 § 2254(d)(1) or § 2254(d)(2).  *See Williams v. Taylor*, 529 U.S. 362, 403 (2000).  The Supreme

23 Court interprets § 2254(d)(1) as follows:

24         Under the "contrary to" clause, a federal habeas court may grant the writ if the state
        court arrives at a conclusion opposite to that reached by this Court on a question of
25        law or if the state court decides a case differently than this Court has on a set of
        materially indistinguishable facts.  Under the "unreasonable application" clause, a
26        federal habeas court may grant the writ if the state court identifies the correct
        governing legal principle from this Court's decisions but unreasonably applies that
27        principle to the facts of the prisoner's case.

28 *Id.* at 412-13; *see also Lockyer v. Andrade*, 538 U.S. 63, 73-74 (2003).

1  //

2  Where there is no reasoned decision from the state's highest court, the Court "looks through"

3  to the underlying appellate court decision.  *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991).  If the

4  dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must

5  conduct an independent review of the record to determine whether the state court's decision is

6  contrary to, or an unreasonable application of, clearly established Supreme Court law.  *See Delgado*

7  *v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Lockyer*, 538 U.S. at 75-

8  76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).  A state court, however, need

9  not cite Supreme Court precedent when resolving a habeas corpus claim.  *Early v. Packer*, 537 U.S.

10  3, 8 (2002).  "[S]o long as neither the reasoning nor the result of the state-court decision contradicts

11  [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" or an unreasonable

12  application of clearly established federal law.  *Id.*

13      **B.    Analysis**

14  Torres alleges the following claims in his petition.  First, he claims he was denied his Sixth

15  and Fourteenth Amendment rights when the prosecutor improperly struck African-Americans from

16  his jury in violation of *Batson v. Kentucky,* 476 U.S. 79 (1986).  (Pet. at 6, Attachment A at 3-9.)

17  Second, he alleges that constitutionally insufficient evidence supported his conviction on Count 14 -

18  conspiracy to furnish a firearm to a felon.  (Pet. at 7 and Attachment A at 9-11.)  Third, he claims

19  that his Fourteenth Amendment right to due process was violated when the jury was inadequately

20  instructed regarding accomplice testimony.  (Pet. at 8 and Attachment A at 11.)  Respondent

21  contends the state court's adjudication of these claims was neither contrary to, nor an unreasonable

22  application of, clearly established Supreme Court law.  (Mem. of P. & A. in Supp. of Answer at 5-

23  26.)

24      1.    *Batson Claim*

25  The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution

26  prevents a prosecutor from systematically eliminating potential jurors on the basis of racial identity.

27  *Batson*, 476 U.S. 79.  Torres argues that the prosecutor systematically used his peremptory

28  challenges to exclude three African-American female jurors, one African-American male juror, and

1   one Hispanic male juror from his jury in violation of the federal Constitution and *Batson*.  Torres

2   raised this claim in his petition for review filed in the California Supreme Court, and that court

3   denied the claim without reasoned decision.  (Lodgment Nos. 13 and 16.)  Accordingly, this Court

4   must "look through" to the California appellate court's opinion denying this claim as the basis for its

5   analysis.  *Ylst*, 501 U.S. at 801-06.

6          In its opinion, the state appellate court summarized the following facts, which are supported

7   by the record, with regard to the voir dire, the prosecutor's peremptory strikes of the four jurors, and

8   the trial court's rulings on the defense's *Batson* objections:

9          [¶] During what turned out to be the initial round of peremptory challenges, the
       prosecutor excused six jurors, including an African-American woman (juror number
10       16) and a Hispanic man (juror number 43). When the prosecutor excused the
       Hispanic man, defense counsel [FN5] made a Batson-Wheeler[4] objection, contending
11       the prosecutor had excused the only African-American woman and the only Hispanic
       man in the jury box. Defense counsel asserted the prosecutor was deliberately
12       attempting to eliminate minorities, and the excusal of Hispanics was of particular
       concern because the defendants were Hispanic. In response, the trial court referred to
13       a lengthy questionnaire the Hispanic man (and all prospective jurors) had completed
       and noted that he had stated on his questionnaire that his brother had been charged
14       with various crimes and he believed the prosecution had treated his brother
       improperly. Based on this, the trial court denied the Batson-Wheeler motion.
15
          [¶] The peremptory challenges continued, and the prosecutor excused one additional
16       juror. The parties were then satisfied with the jury and the jurors were sworn.
       Thereafter, juror number 38 (the only African-American male then on the jury)
17       advised the court that he did not think he could stay focused on the case because of its
       magnitude and he was generally not comfortable with the case. The trial court
18       excused juror number 38 and reopened the peremptory challenges.

19          [¶] The prosecutor excused 11 more jurors, including an African-American/Filipino
       woman (juror number 80) and an African-American male (juror number 85). Defense
20       counsel made a second Batson-Wheeler objection. Defense counsel noted the
       prosecutor had excused two more African-American jurors, and argued this
21       demonstrated a pattern of discrimination and an attempt to exclude minorities.
       Defense counsel argued that although juror number 85's questionnaire stated that he
22       believed there was racial profiling, this was not a sufficient basis to excuse him.

23          [*4] [¶]  The prosecutor argued there was no prima facie case of discrimination
       against African-Americans, stating his notes indicated juror number 80 was Filipino,
24       and the prosecutor had earlier allowed an African-American male to remain on the
       jury (juror number 38, subsequently excused by the court at the juror's request).
25       Further, the prosecutor stated there was no showing of discrimination against
       minorities in general, noting there were three Hispanic males currently on the jury.
26
          [¶] The trial court denied the second Batson-Wheeler challenge, stating the prosecutor
27       had passed on African-American juror number 38, and in the court's recollection juror

28       _____

          [4]  *People v. Wheeler*, 22 Cal. 3d 258 (1978) is the California version of *Batson*.

number 80 had not indicated she was African-American on her questionnaire, and thus "this is really the first one."

[¶] Peremptory challenges continued, and the prosecutor excused seven more jurors, including an African-American woman (juror number 113). Defense counsel objected on Batson-Wheeler grounds for a third time. Defense counsel asserted the prosecution was excusing all African-Americans, there were very few minorities on the jury, and there was no valid reason to excuse juror number 113. The prosecutor responded there was no prima facie case of discrimination, noting there was an African-American male on the jury, the prosecutor had earlier passed on African-American juror number 38, and there were minorities on the jury. At this time, six of the 12 jurors in the jury box were minorities, including one African-American male, one Native American male, three Hispanic males, and one Filipino/Irish male. The trial court denied the third Batson-Wheeler motion, stating there were minority (including African-American) jurors on the panel.

[¶] Thereafter, there was one additional peremptory challenge exercised by the defense (replacing a Caucasian juror with a Filipino juror), and the 12 jurors were sworn. The final jury consisted of seven minority jurors (an African-American male, a Native American male, three Hispanic males, a Filipino/Irish male, and a Filipino male). The five remaining jurors were Caucasian, consisting of one male and four females.

(Opinion at *3-4.)

The following record excerpts set out the voir dire questioning of the excused prospective jurors and the trial court's comments and rulings on defense counsel's *Wheeler/Batson* challenges.

           a.     *Voir Dire of Prospective Juror No. 16*

During voir dire, Torres' counsel, Mr. Leahy, questioned Juror No. 16 (listed on her juror questionnaire as a 61-year-old female, no ethnicity/heritage specified) as follows:

[By Mr. Leahy] Q: You've had some education in the area of criminal justice; is that correct?

A: Correct.

Q: And you've also indicated that it's something that you'd like to pursue further in the future; is that right?

A: Correct.

Q: What type of work would that be preparing you for?

A: Just to say I did accomplish something.

Q: Okay. Would I be correct that you don't necessarily want to work in the area of criminal justice?

A: No. I'm cool.

Q: Okay. So this is just something that interests you and you'd like to pursue it?
A: That was one of my fields when I was in high school. And I never did finish, I

1    started, then I had to take care of my grandmother, so –

2    Q: How would you go about – well, maybe you haven't even planned this far. [¶]
     What do you think you'd do to further your education in the area of criminal justice?

3

4    A: Attend college.

5    Q: Okay.  Do you have – have you looked into it enough to know where you might
     want to go?

6    A: Not really.  It's a lot of credible colleges around.  But I haven't made up my mind
     yet.

7

8    Q: You also indicate that you had an ex-husband who was a bounty hunter; is that
     right?

9    A: Yes.

10   Q: Was that here in San Diego?

11   A: Yes.  And he goes all around.

12   Q: He's still working in that area?

13   A: Yes.

14   Q: Okay.  Would he share with you his experiences as a bounty hunter?

15   A: No, except he's having fun.

16   Q: I'm sorry.

17   A: Except he's having fun.

18   Q: He wouldn't go into the details of it?

19   A: No.

20   Q: Okay.  You have also been a member of a neighborhood watch program?

21   A: Still are.

22   Q: Still are?

23   A: (Nods head).

24   Q: How long have you been working with them?

25   A: I believe this is my second year.  Second year.

26   Q: Thank you.  Would I be correct that you've indicated that you look upon being a
     juror as a learning experience, something where you can learn things?

27   A: Correct.

28   Q: Okay.  You also indicated that you have had some experience in your life regarding

1    prejudice based on ethnicity or culture, religion or gender or culture; is that correct?

2    A: Correct.

3    Q: Has that been here in San Diego, in the county?

4    A: Kind of like, but not really.  From where I come from.

5    Q: Where was that?

6    A: Texas.

7    Q: Okay.  But you still had some experiences even here in San Diego?

8    A: Sure.

9    Q: Now, there is a question here that you were asked whether or not you could judge the
     guilt or innocence of a defendant irrespective of the color of his skin or his or her ancestral
10   heritage, and you answered "No."  Was that just a circle on the wrong answer?

11   A: I think so.  I thought about it afterwards and I said –

12   Q: As you sit here now, do you think that you could judge these men based solely on the
     evidence that's presented here in the courtroom, and that the fact that they may be of a
13   different heritage or ethnicity that that would not matter in your decision?

14   A: It doesn't matter.

15   Q: Okay.  Do you think you can judge them irrespective of their skin color or heritage?

16   A: Do I think –

17   Q: Do you think you could judge them just on the evidence?

18   A: On the evidence only.

19   Mr. Leahy: Thank you, Juror No. 16.  Thanks you very much.

20
     (Lodgment No. 20, Augmented Reporter's Transcript, "Aug RT," vol. 1, 119-22; *see* Lodgment No.
21
     19, Augmented Clerk's Transcript, "Aug CT," vol. 2, 414-28.)
22
                         b.      *Voir Dire of Prospective Juror No. 43*
23
           During voir dire, co-defendant Contreras' counsel, Mr. Apgar, questioned Juror No. 43
24
     (listed on his juror questionnaire as a 46-year-old Hispanic male), as follows:
25
           By Mr. Apgar: Q: . . . This is question 79, which everybody answered equally "No"
26         and equally "Yes."  I think it was one of those.  "Could you judge the guilt or
           innocence of a defendant irrespective of the color of his or her skin or his or her
27         ancestral heritage?"  And you answered "No."

28                                              . . .

           By Mr. Apgar: Q: Okay.  And Juror No. 43, I think – I think you said "No" on 79,

1   too.  [¶] But you would not convict my client simply because of his ethnic heritage, would you?

2   A: No.

3   Mr. Apgar: Okay.  That's – everybody made the mistake on that one.

4   (1 Aug RT 239-241; *see* 3 Aug CT 683-97.)  Later, the trial court held a hearing outside the presence

5   of the jury panel to address Juror No. 43's "confidential" responses on his juror questionnaire:

6   By the Court: Q: . . . On questions 43 and 44, you had "confidential," had something to do with your brother, an assault charge, domestic violence, but apparently was a mistrial. [¶] I think you indicated I think he was not treated right by the prosecution but everyone else treated him okay.  Can you tell us about that?

7

8

9   A: Well, he was arrested in, I believe it was, 1999.  And he had four counts.  I can't remember the other ones.  But I guess it's their job to, you know, prove the guilt of the person.  But I think he was too much when – because I was present – he was tried two times.  And both of them last like a little over two weeks.  And he was constantly over – the victim testified and got caught lying three times, changing her story, and that was the reason it was a mistrial.  Most of it was in favor of not guilty.  That's the only thing, but that's all I have, you know.

10

11

12

13   Q: Okay.  But you indicated you didn't think he was treated right by the prosecution.  You mean because they retried him?

14

15   A: Yeah.  And because the way the victim was pressing the charges and in everybody's eyes it was clear that she was making stories up there.

16   Q: Did you attend the trial?

17   A: Yes, I was present.

18   Q: Both trials?

19   A: Yes, sir.

20   Q: Did you testify?

21   A: No.

22   Q: Okay.  Did he have a retained attorney or public defender?

23   A: A public defender.

24   Q: And how did you think his attorney treated him, fairly?

25   A: Oh, very good.

26   Q: The District Attorney was not Mr. Amador, I take it?

27   A: No, it was not him.

28   Q: Do you feel you have any feelings towards Mr. Amador abased on what somebody in his office did?

A: No.  No, not at all.

Q: You're not going to hold that case against Mr. Amador?

A: No.

The Court: Okay.  Do you have any follow-questions in this limited area?

[Deputy District Attorney] Mr. Amador: Yes, your honor. . . . Was your brother in jail throughout?

A: Yes, the first one.  And the second one he was out on bail.

Q: Okay.  And does that – the fact that he was incarcerated for probably some period of time, I'm sure he didn't like that?

A: Yeah, he didn't.

Q: And you don't like that, do you?

A: No.

Q: Okay.  Did your family or did your brother ever sue the county or anybody?

A: No.

Q: Not at all?

A: No.

Q: Okay.  And do you know who the D.A. was who tried the case, do you remember a name?

A; It was a woman.

Q: How did you feel about that particular Deputy D.A., that woman who tried the case?

A: Well, she was tough, that's all I can say, very tough.  And, I mean, she did her job probably the best that she could, you know, but with the proof that the victim was providing, like changing the story, embarrassing her I believe at points.

Q: Did you think she was fair even though she was tough?

A: Ok, no, she was fair.

Q: And do you hold it against that Deputy D.A. or my entire office, including myself, that – let's say you say the victim was – obviously was lying, that's what you belief is, right?

A: Yes.

Q: The fact that it was retried again by the District Attorney's Office, does that affect towards the D.A.'s Office?

A: No.

Q: Have you had any personal dealings besides this case with your brother with the District Attorney's Office here or anywhere else?

A: No.

Q: Do you remember what courtroom it was in?

A: No.

Q: Was it the same judge each time?

A: Yes.

Q: And do you remember what your brother's attorney's name was?

A: Kate Coyne.

Q: Okay.  And was she the attorney on both trials?

A: Yes.

Q: Have you or your brother remained in touch with her?

A: No.  I – no.  I've seen her name in the newspaper a couple times, but –

Q: Did you like her?

A: Oh, yeah.

Q: Respect her?

A: Yes.

Q: Now, based on all of that, do you think you may have stronger feelings that might favor the defense as opposed to the prosecution in this case?

A: No, sir.  I'll weigh the evidence and everything else.

Mr. Amador: All right.  Thank you.

(1 Aug RT 247-51.)

           c.     *The Trial Court's Batson Inquiry Regarding Peremptory Excusals of Jurors No. 16 and 43*

During peremptory challenges, Deputy District Attorney ("D.A.") Amador thanked and excused Juror No. 16 and Juror No. 43.  (4 Aug RT 774, 777.)  Immediately after Juror No. 43 was excused, Torres' attorney Mr. Leahy made a *Wheeler/Batson* challenge.  (4 Aug RT 777.)  The following proceedings were held in chambers:

Mr. Leahy: Your Honor, Mr. Amador has excused the only Black woman that we had on the panel [referring to Juror No. 16]. And now he's excluding one of the only Hispanic gentlemen that we've had on the panel [referring to Juror No. 43]. [¶] And I think it's the deliberate attempt to eliminate minorities. And I'm very concerned about Hispanics in particular because we have three Hispanic defendants.

The Court: Well, I'm looking at his questionnaire. This is Juror No. 43. [¶] And on question 43 and 44, apparently he had a brother who was charged with assault with a deadly weapon, sodomy and many domestic violence, there was a mistrial. [¶] And question 44 indicates "I think he was not treated right by the prosecution, but everybody else treated him okay." [¶] And I think he expanded upon that, he was a little upset that they retried his brother. [¶] Is that your recollection, Mr. Amador?

Mr. Amador: Forty-three, right, your Honor?

The Court: Yes.

Mr. Amador: Yes.

The Court: I mean, I have the questionnaire here, if you want to look at it.

Mr. Amador: Yes, I just wanted to make sure.

The Court: Okay. I'm going to deny the motion, but I'm watching out for it.

Mr. Leahy: Thank you, Your Honor.

(4 Aug RT 777-78.)

                    d.     *Voir Dire of Prospective Juror No. 80*

During voir dire, co-defendant Contreras' counsel, Mr. Apgar, questioned Juror No. 80

(listed on her juror questionnaire as a 25-year-old Black and Filipino female) as follows:

Mr. Apgar: . . . [¶] Now, Juror No. 80, you haven't been picked on yet. I noticed in your questionnaire that, it may have been inadvertence, you said you could not be impartial. Is that what you meant?

Prospective Juror No. 80: I just have to remain open-minded.

The Court: Can you talk to me please and not to Mr. Apgar. Thank you. My court reporter is here. Okay?

Prospective Juror No. 80: I'm sorry. [¶] I'll just keep an open mind honestly. This is my first time even being summoned, so it's for me – I can be either way. I just hear everything first and then make my decision. I'm not jumping into the courtroom saying this person is guilty because from what I heard or what I read.
Mr. Apgar: Are you willing to sit on the jury?

Prospective Juror No. 80: Yes, I am.

(2 Aug RT 323-24; *see* 4 Aug CT 938-52.) Later, Juror No. 80 was questioned by Deputy D.A.

Amador with regard to juror question No. 107 ("Do you know much about wiretaps?  If yes, what do you know?") as follows:

> Mr. Amador: Q: Let me ask Juror – prospective juror No. 80, I said that – in that question you said "phone taps as well as undercover."  Do you remember that, answering the question that way?
>
> A: Vaguely.  Vague, but –
>
> Q: What does that mean "phone taps as well as undercover"?
>
> A: Just my opinion.  I think it's – you have a phone tap, it's basically trying to find out what's going on, such as undercover work.
>
> Q: You were just describing what you thought it was –
>
> A: Yeah.
>
> Q:  – the process was. [¶] Any problems with that?
>
> A: No.

(2 Aug RT 366-67; *see* 4 Aug CT 947.)

e.    *Voir Dire of Prospective Juror No. 85*

During voir dire, Deputy D.A. Amador questioned Juror No. 85 (listed on his juror questionnaire as a 49-year-old Black male) as follows:

> Q: No, Juror No. 85, let me ask you a couple of questions.  We'll go in reverse order. [¶] I note that in your questionnaire you mentioned something about burglaries, and then the police never found the robbers, is that true?
>
> A: Uh-huh, correct.
>
> Q: Okay.  Now, I think we all understand that sometimes crimes aren't solved.  But you actually have had a personal experience where it seems that the police were called and the crime wasn't solved and nobody was ever brought to justice; is that a fair assessment?
>
> A: That's correct.
>
> Q: Okay.  Any lingering negative feelings towards the police or the system even with regards to that situation?
>
> A: No.
>
> Q: Did the police do their job in your opinion?
>
> A: Yes.  They came and took a report.
>
> Q: Should they have done more?

A: Well, okay, yes, but that was the extent.  There was nothing more they could do.  They even explained to me they're not likely to find out who did it.

Q: And was this a residential burglary?

A: Correct.

Q: Were you or was anyone else at home at the time?

A: No.

Q: And did you have a lot of property stolen?

A: Not a lot.  Sentimental things.

Q: Sentimental things. [¶] And how long ago did this happen?

A: 1989, 1990.

Q: Did they fingerprint the house?

A: No.  Oh, yes, they did.  They did try to take some prints.

Q: So they did take some steps to at least try to find some evidence to try to find out who did this to you; is that right?

A: Yes.

Q: Okay.  But there was no violence involved in that case, per se, correct?

A: No.

Q: Okay.  Do you have – I asked you if there were any lingering negative feelings towards the police, and you said "No," and I understand that. [¶] How about towards the people who did that residential burglary, or others, you know, people who burglarize houses, do you have any particular negative feelings towards those types of people?

A: Yes.  Yes.  People that steal and invade others' privacy, I don't agree with that.

Q: If one of the charges in this case dealt with that type of situation, how would you feel?

A: Well, I would listen to the evidence and I wouldn't be biased because of that.  I would consider if it's true or not true.

Q: Now, you live in a particular are of town.  We don't have to bring it up right now.  How long have you lived there?

A: On and off all of my life.  But the last stint was six years.

Q: Do you live there now?

A: Yes.

Q: And in your questionnaire you said you have no knowledge of gangs in that area

1    or in your area; is that fair?

2    A: I can't say they are gangs.  There is some activity.  Every once in a while I hear
     gunshots and things of that nature, but I can't say that those are gangs – those are
3    gang members.

4    Q: Are there persons in the neighborhood that you see that at least your first
     impression is that's a gang member?
5
     A: Well, it's possible.
6
     Q: You don't want to judge that person, do you?
7
     A: No.  I can't
8
     Q: And make assumptions?
9
     A: I can't.
10
     Q: And I'm not asking you to make any legal determination right now.  But, generally
11   speaking, in your neighborhood, do you see graffiti, gang graffiti?

12   A: Not in my immediate area.  When I drive up around, I see some at times.

13   Q: To go to the store, to come off the freeway or something along those lines, do you
     ever see gang graffiti?
14
     A: Correct, yes.
15
     Q: Okay.  And you hear gunshots sometimes at night?
16
     A: Yes.
17
     Q: And you're not assuming that's gang related?
18
     A: I assume it's gang related, but I don't know for a fact.  I can't tell somebody else
19   that was definitely gang related.

20   Q: Okay.  Because on those questions, it was basically does it affect your life at all,
     and you just basically put "not at all." [¶] But now asking you a little more into it, it
21   seems like you see graffiti in your neighborhood, if you hear shots at night, that you
     assume it may be gang related, that's go to affect you a little bit.
22
     A: Affect me in a way to where it is something I can't sleep at night about, no.
23
     Q: In your prior jury service – and you're very lucky, four jury trials, and looks like
24   every couple years.

25   A: Yes.

26   Q: So you're due, right?

27   A: Right.

28   Q: One of the answers you put was regarding jury service, you said "if all of the
     instructions are adhered to, it could be tough to reach a verdict." [¶] Do you
     remember writing that?

A: Yes.

Q: What do you mean by that?

A: Well, you sit through the case during a trial and you hear the evidence, and you sort of form your own opinion about you feel it's the truth or where you're going to decide. [¶] But then there's the instructions, and the instructions, you follow them, it's pretty tough to do.  And if it's pretty tough for all 12 to follow the instructions step by step, because we pretty much go by our feelings and you're not supposed to, according to the instructions, use your feelings, you're supposed to go by the evidence, if this is this, then this is this, and if that is that, then that is that, and keep all of that in mind for 12 jurors and then come to a decision.  I guess that's why the deliberations sometimes take so long.

Q: But you were able to reach verdicts in the past?

A: Correct.

Q: Do you think the instructions are – say overly use too much legalese or technical language where it's hard to decipher exactly what's meant?  Have you had that experience?

A: My first trial was now exposed to the legalese and instructions and this and that. And go easier after I was settled on the cases.  And now I understand what's going on to speak of.

Q: In any of those times when you were deliberating, were there any times where you just thought to yourself "this is a terrible process.  There must be a better way"?

A: No.

(2 Aug RT 372-77; *see* 4 Aug CT 998-1012.)

                  f.    *The Trial Court's Batson Inquiry of Peremptory Excusals of Jurors No. 80 and 85*

During peremptory challenges, Deputy D.A. Amador thanked and excused Juror Nos. 80 and 85.  (4 Aug RT 790.)  Immediately, Torres' attorney Mr. Leahy made a *Wheeler/Batson* challenge. (*Id.*)  The following proceedings were held in chambers:

Mr. Leahy: Your Honor, I didn't make a Batson/Wheeler challenge for the Black woman who was just released.  Now we've had two more Black jurors excused by the District Attorney. [¶] The Juror No. 85, and I believe it was No. 80, the large Black woman, was also excused by the District Attorney's Office. [¶] I think this clearly establishes a pattern of behavior of discrimination on the part of the District Attorney. I looked through the No. 85's questionnaire, and he had four criminal juries service and on four different cases in '94, '96, '98 and 2001. [¶] I don't see anything else in his questionnaire that might suggest that he is, for some reason, a biased individual. He does make a comment that he believes that there's profiling, but I don't think that that is a sufficient basis to excuse him.  And I think that Mr. Amador is again attempting to weed minorities out of the jury.

1

2      Mr. Apgar: The only person that asked him any questions was me. And I just – the
       only thing I said was, "have you served on four juries?" and he said, "Yes." And that
3      was the extent of the voir dire of that juror.[5]

4      The Court: Mr. Cox?

5      Mr. Cox: Joining.

6      The Court: Okay. Mr. Amador?

7      Mr. Amador: Well, Your Honor, first of all, with regards to whether there has been a
       prima facie case made or not, I do not believe there has been a prima facie case made.
8      [¶] First of all, I'm not really clear what the challenge is because Mr. Leahy, in my
       opinion, has not articulated exactly what he thinks that the People are doing. [¶]
9      We've got different races that he's bringing up each time. He brought up Hispanic
       female and then a Black male before. And now he's bringing up a Black male that
10     was just challenged. [¶] And from my notes, Juror No. 80 said she was Filipino, so –
       and that's just, of course, me checking over my notes after the challenge has been
11     made clearly. So in that sense on the first hurdle, I'd like to hear exactly what they
       are articulating I'm supposed to be doing. [¶] They're not obviously saying a
12     particular race, just whatever minority. What does that include to them? Does that
       include Filipino, Black, Hispanic, Asian? I don't know. [¶] I mean, are they saying
13     that every time I challenge somebody who's not a white male or white female then
       that's a sufficient reason for a Batson/Wheeler challenge? I don't believe so. [¶] And
14     at least on the point of African-Americans, I passed and we had a juror who was an
       African-American male who was ready to be sworn, and then he came in here and
15     was removed for cause by the court. He was a good juror for me obviously, I had
       passed on him. And I didn't have anything to say with regards to the court excusing
16     him for cause. [¶] So, first of all, I don't believe that they've made any prima facie
       case.
17
       The Court: Do you want to further amplify, Mr. Leahy, or not?
18
       Mr. Leahy: No, your honor.
19
       The Court: Okay. Well, as I indicated, I'm keeping track of particularly the
20     prosecution's challenges. And I do note that he passed on the African-American
       gentleman that was about to be sworn as a juror in this case. [¶] And, as I recall, Juror
21     No. 80, who has been referred to, although she may look African-American, I think
       she's indicated on the questionnaire that she's other than that. So this is really the
22     first one. [¶] So I'm going to deny the challenge, the Batson challenge.

23     Mr. Amador: Your honor, one other thing I wanted to note for the record that,
       obviously, the defendants are Hispanic and there are three Hispanic males, they're all
24     males that are sitting on the jury right now.

25     The Court: Well, I don't think that Batson/Wheeler is limited to Hispanics.

26     Mr. Amador: I agree.

27     The Court: It's minorities.

28
       ──────────────
       [5]This was an incorrect recollection by Mr. Apgar. (*See* 2 Aug RT 372-77.)

Mr. Amador: I agree.  I know it's not limited.  It's not as if the prospective juror that is challenged has to be of the same race as the defendants.

The Court: I understand.

Mr. Amador: To just note the overall argument that it's overall minorities, that's not the case.

The Court: Okay.

(4 Aug RT 791-94.)

g.     *Voir Dire of Prospective Juror No. 113*

During voir dire, co-defendant Contreras' attorney questioned Juror No. 113 (listed on her juror questionnaire as a 28-year-old "Afro. American" female) as follows:

Q: Juror No. 113, now here again, you correct me if I'm wrong, okay.  And on no. 54, the question was "generally speaking, do you feel you can be an impartial juror?" And you said, "No."  And why is you have to hear all the facts of evidence until proven guilty.  So that was just the way you interpreted the question, impartial, meaning that, you know, you can go either way. [¶] Can you go either way or am I confusing you?

A: With the question did it say I can't?

Q: No.  The question said, "Can you be – do you feel you can be an impartial juror?" And you said, "No." [¶] That was just misinterpreting the question?

A: It was.  It was.

Q: Okay.  And you're not alone, okay.

(2 Aug RT 414-15.)  Later, Deputy D.A. Amador questioned Juror No. 113 as follows:

Q: Prospective Juror No. 113, how are you, ma'am?

A: Fine.

Q: And are you currently a cosmetologist?

A: Uh-huh.

Q: Yes?

A: Yes.

Q: All right.  And how long have you been doing that?

A: For about five years.

Q: Are you full-time?

A: Yes, I am.

Q: Do you work in a shop?

A: No.  I work out of my home.

Q: Out of your home?

A: Out of my home.

Q: All right.  And I'm not sure if you answered this question.  Do you own or rent?

A: I rent.

Q: All right.  And I noted that the person who lives with you is disabled?

A: Yes, sir.

Q: And do you take care of that person?

A: Yes, sir.

Q: Is this going to be a hardship being here every day from 9:00 to 2:00 when this person is going to be at home?

A: No.

Q: Had you --

A: No.

Q:  -- you made other arrangements?

A: Yes, I have.

Q: Okay.  And I know that Mr. Apgar asked you a couple questions.  Apparently there was a misunderstanding or misinterpretation of a couple questions.  And don't worry about that.  You know, a lot of times lawyers don't really write, you know – just like the judge was talking about with jury instructions and things like that, sometimes it's overly technical, too much legalese.  And we apologize for that. [¶] But let me ask you one thing.  You put in there, I notice you said that you'd been shot at before?

A: Uh-huh.

Q: Is that a yes or no?

A: Yes.

Q: Okay.  And can you explain or describe that situation?

A:  Well, it was several years ago.  I was going out to the movies with an ex-boyfriend.  We ran into an altercation with like some young kids.  I guess they were like some type of gang or something like that. [¶] They wanted to talk to a couple of us, but they didn't want to talk to them because they wanted to like get into some trouble, go and take things.  I mean, because we seen them taking things from other kids around in the movie theater parking lot.

1    Q: Was this in the parking lot?

2    A: Yes.

3    Q: Where was it?

4    A: This was back home in Cincinnati, Ohio.

5    Q: Okay.  And this ex-boyfriend, was he a member of a gang or anything like that?

6    A: No, he wasn't.

7    Q: This was just –

8    A: Basically in the wrong place at the wrong time.

9    Q: Uh-huh. [¶] How do you know that they were gang members who were approaching you?

10    A: They were throwing up like little gang signs and saying like gang quotes.

11

12    Q: Okay.  So then what happened at the end, they're throwing gang quotes and gang signs, what happened?

13    A: We tried to approach into the theater, they didn't allow us.  I wanted to call security.  Security didn't come.  And then that's when they pulled out a gun.

14    Q: And what happened?

15

16    A: After that point, they wanted basically to take everything that we had, we didn't – we didn't give up anything, and they didn't shoot at us.

17    Q: They did not?

18    A: They did not.  They just pointed the gun at us.

19    Q: It was an attempted robbery, is that it?

20    A: Yeah, it was.

21    Q: They pointed a gun at you?

22    A: Yes.

23    Q: Demanded your property?

24    A: Yes.

25    Q: And you and your boyfriend --

26    A: Yes, and a couple friends.

27    Q: Other people were there with you?

28    A: Yes.

    Q: That must have been pretty scary?

A: Yes.

Q: How long ago was this?

A: I think over ten years ago.

Q: Because I do notice that in your questionnaire you said basically "have you ever been affected by gang violence," and you put "not at all."

A: No.

Q: Did this come to mind?

A: No.

Q: You wouldn't consider this gang violence?

A: No, I wouldn't .

Q: Okay.  Would they have to have pulled the trigger for you to consider it gang violence?

A: No.  No.  Maybe.  Maybe.  But I didn't look at it that way as being gang violence. I mean, with them throwing up gang signs, maybe I should have looked at it that way, but I didn't.

Q: Okay.  And you said that you are familiar with some gangs in San Diego, including Bloods and Crips and some others; is that right?

A: Not familiar with them, but just hearing other people talk about them.

Q: Okay.  The area that you live now, any gang problems there?

A: No, not that I know.

Q: It's close to an area where there's a lot of gang-related activity though, isn't it?

A: Yes, it is.

Q: Maybe going to the store or coming off the freeway do you see graffiti or anything like that around the neighborhood?

A: I do.  I do.

Q: And are you able to determine what type of graffiti it is, like know what gang it is or what it says?

A: Not from what gang it is, but to notice like what it says.

Q: Okay.  Basically claiming a turf?

A:  I wouldn't say as claiming a turf.  I mean, I just always seen it as being graffiti. Might say some type of word on it, but I wouldn't know if it was describing some type of turf or anything like that.

1    Q: Did you ever see people that you think to yourself "Ok, oh, that might be a gang
2    member, and I need to stay away"?

     A: No.

3    Q: Okay.  Do you hear shots at night?

4    A: No.

5    (2 Aug RT 466-71; *see* 5 Aug CT 1223-37.)

6                    h.    *The Trial Court's Batson Inquiry of Peremptory Excusal of Juror No.*
7                          *113*

8           During peremptory challenges, Deputy D.A. Amador thanked and excused Juror No. 113.  (4
9  
10   Aug RT 798.)  Immediately after Juror No. 113 was excused, co-defendant Contreras' attorney Mr.

11   Apgar made a *Wheeler/Batson* challenge.  (*Id.*)  The following proceedings were then held in

12   chambers:

13          Mr. Apgar: 113, I believe she's Black, your honor.  And I think outside of the one
            juror, I think Mr. Amador has pretty much kicked off every Black juror.  And I don't
14          see by Black jurors left.  There may be some out in the hall.

15          The Court: No.  There is one in the audience, there's one in the box now.  We still
            have two – actually another Black male.

16          Mr. Apgar: So I think it's – he's kicking off all the Blacks.  And our clients are
17          Hispanic.  But there are very few minorities on this jury panel and they've been
            decimated.  I don't see any reason why she would otherwise be kicked.

18          The Court: Okay.  Mr. Amador?

19          Mr. Amador: Your honor, again, with regards to the prima facie showing, I believe
20          almost everything Mr. Apgar said was inaccurate. [¶] First of all, there are numerous
            minorities, if he wants to discuss the entire panel.  There are numerous minorities that
21          are on the panel, which if you're going to say the "minority," that includes Asians,
            Filipino, African-American, Hispanic, that's the way they're defining it. [¶] So I think
22          the record is clear, with the questionnaires, there are numerous individuals who are not
            White. [¶] Secondly, there's an African-American gentleman sitting in the jury box
23          right now.  We already have the record with regards to the other African-American
            that was ready to be sworn as a juror. [¶] There are other African-Americans out in the
24          audience.  And I still don't see any articulation of why we would be kicking African-
            American jurors as opposed to any other minority to what the defense is saying.

25          The Court: Okay.  Well, I'm going to deny it.  As I've indicated, I'm keeping track of
26          it.  And we do have African-Americans on there and other minority.  So it's denied.

     (2 Aug RT 798-99.)
27
                 i.    *Analysis of the Batson Claim*
28
                          i.    *The Appellate Court's Opinion*

[¶] Peremptory challenges to strike prospective jurors need not be supported by cause; the challenges may be based on even trivial reasons or hunches, including body language and the manner of answering questions. (*People v. Reynoso* (2003) 31 Cal.4th 903, 917; *People v. Cornwell* (2005) 37 Cal.4th 50, 70; *Snyder v. Louisiana* (2008) 552 U.S.472 [128 S.Ct. 1203, 1208] (*Snyder*) [juror's demeanor can support peremptory challenge].)  However, under both the federal and state Constitutions, peremptory challenges may not be based on group bias. (*Batson v. Kentucky, supra,* 476 U.S. at p. 88; *People v. Wheeler, supra,* 22 Cal.3d at pp. 276-277; *People v. Bell* (2007) 40 Cal.4th 582, 596.)

[*5] [¶] The trial court's evaluation of a defendant's *Batson-Wheeler* motion occurs in three stages. First, the defendant must make a prima facie showing that the totality of relevant facts gives rise to an inference of discriminatory purpose. Second, if there is a prima facie showing, the burden shifts to the prosecutor to offer nondiscriminatory justifications for the strikes.  Third, if nondiscriminatory explanations are presented, the trial court must then decide whether the defendant has proved purposeful discrimination. (*People v. Bell, supra,* 40 Cal.4th at p. 596.)

[¶] To make a prima facie showing, the defendant need only produce evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred. (*People v. Cornwell, supra,* 37 Cal.4th at p. 67.)  The defendant may cite evidence showing the prosecutor has struck most or all of the members of the identified group; the prosecutor has used a disproportionate number of peremptory challenges against the group; the excused jurors share only their membership in the group in common but are otherwise heterogeneous; the prosecutor engaged the excused jurors in merely cursory, or no, voir dire; the defendant is a member of the excluded group; and the victim is a member of the same group as the majority of the remaining jurors. (*People v. Bell, supra,* 40 Cal.4th at p. 597.)  In deciding whether the defendant has presented a prima facie case, the trial court should consider all relevant circumstances. (*Ibid.*)  On appeal, we review the trial court's ruling on this issue for substantial evidence. (*People v. Huggins* (2006) 38 Cal.4th 175, 228, fn. 13.)

[¶] Here, although the trial court did not expressly rule that the defense had not made a prima facie showing of discrimination, it is apparent from the record this was the basis for the court's denial of the *Batson-Wheeler* motions. After the first objection, the trial court did not ask the prosecutor to state his reasons for the excusals.  Rather, the court simply denied the motion based on its evaluation of the excused Hispanic juror's questionnaire.  After the second and third objections, the trial court asked the prosecutor for a response and the prosecutor argued no prima facie case had been made.  Again, the trial court did not ask the prosecutor to state his reasons, but merely denied the motions after the prosecutor argued there was no prima facie case.  Accordingly, we consider whether the record supports the trial court's implied findings that there was no prima facie showing of discriminatory purpose. (*See People v. Bonilla* (2007) 41 Cal.4th 313, 345; *People v. Howard* (2008) 42 Cal.4th 1016, 1018.)

[¶] At the time of the first motion, the prosecutor had excused six jurors, including an African-American female (juror no. 16) and a Hispanic male (juror no. 43).  Defense counsel asserted the prosecutor was eliminating minorities, and that the elimination of Hispanics was of particular concern.  Based on a review of the Hispanic juror's questionnaire, the trial court ascertained that this juror had expressed a belief that the prosecution had treated his brother unfairly.  This was an obvious race-neutral justification for the prosecutor's exclusion of this juror.  The trial court reasonably denied the first *Batson-Wheeler* motion because the Hispanic juror's bias against the prosecution belied any inference of discriminatory motive.

[*6] [¶] Contrary to defendants' assertion on appeal, the trial court's reliance on juror

number 43's questionnaire was not improper speculation into the prosecutor's reasons for the excusal.  Once a prima facie showing is made by the defendant, the trial court should not speculate about the prosecutor's reasons but should require the prosecutor to provide an explanation.  (*People v. Cornwell*, *supra*, 37 Cal.4th at pp. 73-74.)  However, the trial court must first make the threshold inquiry as to whether the record can support an inference of discriminatory purpose.  (*Ibid.*)  If the information available to the court shows any prosecutor would excuse the juror for nondiscriminatory reasons, this defeats a prima facie showing.  (*See id.* at pp. 69-70, 73-74.)  Because juror number 43's clear statement of bias against the prosecution in the questionnaire would cause any prosecutor to excuse him, the trial court properly relied on this information to deny the motion without further inquiry as to the prosecutor's actual reasons.

[¶] Defendants assert the trial court's ruling was erroneous because the court failed to evaluate the *Batson-Wheeler* challenge as to juror number 16.  When defendants made the first *Batson-Wheeler* challenge, juror number 16 was the only African-American that had been excused by the prosecutor.  The premise of the motion was that the prosecutor was discriminating against minorities (i.e., an African-American and a Hispanic). In effect, the evidence of discriminatory purpose as to juror number 16 was based on the combined effect of excusing both juror numbers 16 and 43.  Once the court ascertained an obvious nondiscriminatory purpose for excusing juror number 43, there was no need for the court to further address the challenge to juror number 16.  Absent some other indication of discriminatory motive, the removal of one member of an identified group from the jury is normally insufficient to support an inference of discriminatory bias.  (*See People v. Bell*, *supra*, 40 Cal.4th at p. 598 and fn. 3 [the exclusion of one or two jurors of a particular group can rarely suggest discriminatory purpose].)

[¶] The second *Batson-Wheeler* challenge was made after the prosecutor excused an African-American/Filipino woman (juror no. 80) and an African-American man (juror no. 85).  Defense counsel noted the excusal of two more African-Americans, and argued the prosecutor was attempting to exclude minorities.  By this time, there were three Hispanic jurors on the jury.  Further, the prosecutor had earlier passed on an African-American juror, and that juror had been removed for cause at the juror's, not the prosecutor's, request.  The trial court reasonably concluded that there was no prima facie showing of discriminatory purpose given that the prosecutor had accepted three Hispanic jurors and had earlier accepted an African-American juror.  Notably, the second *Batson-Wheeler* objection was directed at the exclusion of two African-Americans, whereas the defendants are Hispanic.  Although a defendant need not be a member of the excluded group to raise a discrimination claim, the absence of this factor is relevant to the determination of whether the defendant has made a prima facie case.  (*People v. Bell*, *supra*, 40 Cal.4th at pp. 597, 599-600.)

[*7] [¶] We note, as emphasized by defendants on appeal, the trial court did err when it stated its recollection that the African-American/Filipino woman (juror no. 80) was not African-American.  This juror's questionnaire identifies herself as African-American/Filipino.  However, this factual error does not require reversal.  Exercising our independent review-and for the reasons just stated-we likewise conclude the record does not show a prima facie case of discrimination arising from the dismissal of juror numbers 80 and 85.  (*See People v. Bell*, *supra*, 40 Cal.4th at p. 597 [appellate court may independently review whether record supports inference of discrimination].)

[¶] The trial court's statement after the excusal of African-American juror numbers 80 and 85 that "this is really the first one" suggests that it may also have forgotten about the earlier excusal of African-American juror number 16.  Assuming this is so, and

exercising our independent judgment, we find no inference of discriminatory motive at this point arising simply from the excusal of three African-American jurors.  As stated, the prosecutor had accepted an African-American juror and three Hispanic jurors, and the defendants are Hispanic, not African-American.

[¶] Defense counsel made the third *Batson-Wheeler* motion based on the exclusion of another African-American woman (juror no. 113), arguing discrimination against African-Americans and minorities.  Defendants argue the excusal of a total of four African-American jurors shows a discriminatory purpose against this racial group.  At the time the fourth African-American juror was excused, the jurors accepted by the prosecution and seated in the jury box included an African-American male, three Hispanic males, a Native American male, and a Filipino/Irish male.  Thus, there were three seated jurors who were the same ethnicity as the defendants; there was a seated African-American juror; and the prosecutor had earlier accepted another African-American juror.  Given the minority jurors accepted by the prosecutor (including African-Americans and jurors of the same ethnicity as the defendants), the trial court could reasonably infer the prosecutor did not have a discriminatory purpose to eliminate African-Americans or any other minority group.

[¶] To support their claim of discrimination, defendants note that the prosecutor excused all three African-American females that were called to the jury box. When making their *Batson-Wheeler* objections before the trial court, defendants asserted the prosecutor was attempting to exclude minorities (in particular Hispanics and African-Americans).  Defendants did not contend the prosecutor was singling out African-American females; thus this claim is forfeited on appeal.  (*People v. Cornwell*, *supra*, 37 Cal.4th at pp. 70-71, fn. 4.)  In any event, exercising our independent review, the fact that there were no African-American females left on the jury does not alone support an inference of discriminatory purpose in this case.  An African-American male and four Caucasian women were on the jury.  The defendants are not African-American females.  There is nothing about the facts of the case which would suggest that African-American females might favor the defense.  Under these circumstances, the record does not suggest a discriminatory purpose based merely on the prosecutor's excusal of the three African-American woman.  (*See People v. Bonilla*, *supra*, 41 Cal.4th at pp. 344-345.)

[*8] [¶] Defendants assert that an inference of discriminatory purpose against African-Americans was shown because during voir dire questioning, the prosecutor did not engage in meaningful voir dire of two of the excluded African-American females, *i.e.*, he did not ask juror number 16 any questions and he asked juror number 80 only one short question.  First, the weight of this factor is of less significance in a case where, as here, the jurors filled out questionnaires which gave the prosecutor information about their background and attitudes.  (*See People v. Bell*, *supra*, 40 Cal.4th at pp. 598-599, fn. 5.)  Second, as recognized by defendants, the prosecutor questioned the third excused African-American female juror (juror no. 113) at length, and also engaged in lengthy questioning of the excused African-American male juror (juror no. 85).  The record does not show that the manner in which the prosecutor handled voir dire questioning of African-American jurors supported an inference of discriminatory purpose against African-Americans. [FN6]

[FN6. We note also that although the prosecutor did not ask juror number 16 any questions, the defense did question her, thereby giving the prosecutor an opportunity to observe her demeanor.]

[¶] Defendants also contend the trial court erred in its rulings because they were not required to show a pattern of discrimination; rather, the dismissal of even one juror for a discriminatory reason is unconstitutional.  (*People v. Bell*, *supra*, 40 Cal.3d at p.

598, fn. 3.)  However, there must still be some threshold evidence in the record supporting an inference that the prosecutor had a discriminatory motive when excusing one or more jurors.  As set forth above, the trial court reasonably concluded there was no such evidence here.  In a similar vein, defendants argue that reversal is required because the prosecutor failed to point to anything in the record showing a legitimate reason for excusing the four African-American jurors.  The contention is unavailing because absent a prima facie showing of discriminatory motive, the prosecutor had no obligation to explain why he exercised a peremptory challenge to remove a particular juror.

[¶] Finally, defendants request, for the first time on appeal, that we engage in a comparative analysis between the excluded jurors and the retained jurors.  Comparative analysis is used to ascertain whether a prosecutor's proffered reason for striking a juror is pretextual; for example, by showing that a proffered reason applies equally to a retained juror who is not a member of the identified group.  (*See People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1017 (*Lewis* ); *Snyder*, *supra*, 128 S.Ct. at pp. 1211-1212.)  As illustrated in *Lewis*, " 'If a prosecutor's proffered reason for striking a[B]lack panelist applies just as well to an otherwise-similar non[-B]lack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step.' " (*Lewis*, *supra*, at p. 1017; *see also People v. Cornwell*, *supra*, 37 Cal.4th at p. 71.)

[¶] However, although a comparative analysis for the first time on appeal may be appropriate in some cases (*see Lewis*, *supra*, 39 Cal.4th at p. 1017; *Snyder*, *supra*, 128 S.Ct. at p. 1211), it is not appropriate in a case involving only first-stage *Batson-Wheeler* analysis where the prosecutor was not required to, and did not, present reasons for the strikes.  (*People v. Bell*, *supra*, 40 Cal.4th at p. 601.)  As explained in *Bell*, "In the circumstances of this first-stage *Wheeler-Batson* case, comparative juror analysis would make little sense.  In determining whether defendant has made a prima facie case, the trial court did not ask the prosecutor to give reasons for his challenges, the prosecutor did not volunteer any, and the court did not hypothesize any.  Nor, obviously, did the trial court compare the challenged and accepted jurors to determine the plausibility of any asserted or hypothesized reasons.  Where, as here, no reasons for the prosecutor's challenges were accepted or posited by either the trial court or this court, there is no fit subject for comparison.  Comparative juror analysis would be formless and unbounded." ( *People v. Bell*, *supra*, 40 Cal.4th at p. 601.)

[*9] [¶] Here, based on the trial court's rulings of no prima facie case, the prosecutor was not required to, and did not, state his reasons for excusing the jurors.  Accordingly, a comparative analysis to determine whether the prosecutor's reasons were pretextual is not warranted. [FN7]

[FN7. We note that the only instance where the trial court in effect identified a reason for the prosecutor's striking of a juror was when it ascertained the clear statement of bias against the prosecution in Hispanic juror number 43's questionnaire.  Even assuming comparative analysis might be appropriate as to this juror, defendants do not contend, and our review of the record does not reveal, that the prosecutor retained Caucasian jurors who evinced such a clear bias.  Moreover, on appeal defendants confine their challenge to the excusal of African-Americans, not Hispanics.  We note additionally that in *People v. Howard*, *supra*, 42 Cal.4th at page 1020, the court held that even when the prosecution offers reasons for its peremptory challenges, a comparative analysis is not required when the trial court ultimately rules no prima facie discrimination was shown.  (*See also People v. Bonilla*, *supra*, 41 Cal.4th at p. 350.)]

//

1  //

2

3       [¶] Defendants have not cited any evidence that defeats the trial court's rulings that
        there was no showing of a prima facie case of discrimination.  Accordingly, the court
        did not err in denying the *Batson-Wheeler* motions.

4  (Opinion at *4-9.)

5

6              ii.     *Clearly Established Supreme Court Law and the trial court's factual
                       determinations*

7

8       In *Purkett v. Elem*, 514 U.S. 765 (1995), the United States Supreme Court outlined the steps a

   court must follow in conducting a *Batson* analysis:

9

10      Under our *Batson* jurisprudence, once the opponent of a peremptory challenge has
        made out a prima facie case of racial discrimination (step one), the burden of
        production shifts to the proponent of the strike to come forward with a race-neutral
11      explanation (step two).  If a race-neutral explanation is tendered, the trial court must
        then decide (step three) whether the opponent of the strike has proved purposeful
12      racial discrimination.  *Hernandez v. New York*, 500 U.S.  352, 358-359, 111 S.Ct.
        1859, 1865-66, 114 L.Ed.2d 395 (1991) (plurality opinion); *id.*, at 375, 111 S.Ct. at
13      1874 (O'CONNOR, J., concurring in judgment); *Batson, supra*, at 96-98, 106 S.Ct., at
        1722-1723.

14
   *Id.* at 1170-71; *see also Mitleider v. Hall*, 391 F.3d 1039, 1047 (9th Cir. 2004).  The trial court

15 impliedly found in response to each *Wheeler/Batson* challenge that the totality of all relevant facts did

16 not give rise to an inference of discriminatory purpose.  In the case of prospective Jurors No. 16 and

17 43, the trial court essentially stated a race-neutral reason for excusing Juror No. 43 and then denied

18 the challenge.  (4 Aug RT 777-78.)  In the case of prospective Jurors No. 80 and 85, the trial court

19 impliedly found that no prima facie case of racial discrimination in juror selection was made.  (4 Aug

20 RT 791-94.)   With regard to prospective Juror No. 113, the trial court again impliedly found that no

21 prima facie case of racial discrimination had been made.  (4 Aug RT 798-99.)  Although the trial

22 judge did not definitively state that he found no prima facie case made under *Batson* in each incident,

23 his rulings directly implied that finding.  Because the trial court found no prima facie case of

24 discrimination, the second and third prongs of the *Purkett* analysis were, and are, unnecessary.  Thus,

25 the question for this Court on collateral review is whether the state appellate court's findings that the

26 record supported the trial court's implied findings of no prima facie case of discrimination was an

27 objectively unreasonable determination of the facts in light of clearly established Supreme Court law.

28 The undersigned magistrate judge finds and recommends that it was not.

1 │ //

2 │

3 │     A state court's determination as to whether a prima facie case has been made is a factual

4 │ determination entitled to a presumption of correctness. *Tolbert v. Page*, 182 F.3d 677, 685 (9th Cir.

5 │ 1999).  With regard to prospective Juror No. 16, voir dire questioning revealed that she had some

6 │ criminal justice education and that her ex-husband had "fun" doing his work as a bounty hunter.  (1

7 │ Aug. RT 119-22.)  With regard to prospective Juror No. 43, voir dire questioning revealed that his

8 │ brother had been jailed and, in Juror No. 43's mind, had not been treated fairly during two trials for

9 │ violent crimes.  (1 Aug. RT 247-51.)  In light of these facts, the trial court's finding that the

10 │ prosecution's excusal of this African American woman and Hispanic man did not raise an inference

11 │ of discriminatory purpose is amply supported by the record.

12 │     With regard to prospective Juror No. 80, voir dire consisted of brief questioning by Contreras'

13 │ counsel and the prosecutor.  However, a juror's demeanor can support peremptory challenges, and the

14 │ cold record generally does not reveal issues of demeanor.  *Snyder v. Louisiana*, 552 U.S. at 479.

15 │ Moreover, at the time defense counsel made this second *Wheeler/Batson* challenge, there were three

16 │ Hispanics already seated on the jury, and the prosecution had accepted an African-American male

17 │ who was later excused for cause, not at the prosecutor's request.  With regard to prospective Juror

18 │ No. 85, voir dire questioning revealed that he had been the victim of an unsolved burglary.  (2 Aug.

19 │ RT 372-77.)  In addition, his extensive familiarity with jury service (he had previously served on four

20 │ juries) may have raised a concern for the prosecution that prospective Juror No. 85 (a 49-year-old

21 │ male) would be granted excessive influence over deliberations by the other jurors.  (*Id*.)  Again, in

22 │ light of these facts, the trial court's finding that the excusals of this African-American/Filipino

23 │ woman and this African-American man did not raise an inference of discriminatory intent is amply

24 │ supported by the record.

25 │     With regard to prospective Juror No. 113, voir dire questioning revealed that she and her ex-

26 │ boyfriend were mugged at gunpoint in a parking lot by young men exhibiting gang behavior.  (2 Aug.

27 │ RT 466-71.)  Yet, on her juror questionnaire she responded that she had never been affected by gang

28 │ violence.  (5 Aug. CT 1223-37.)  Based on this contradiction, the record supports the trial court's

1  finding that the prosecution's excusal of this African-American woman did not raise an inference of

2  discriminatory purpose, especially in light of the fact that a state court's determination as to whether a

3  prima facie case has been made is a factual determination entitled to a presumption of correctness.

4  *Tolbert*, 182 F.3d at 685.

5        The jury in Torres' case ultimately consisted of one African-American male, one Filipino

6  male, one Irish/Filipino male, two Caucasian males, three Hispanic males, one Caucasian/Native

7  American female, and three Caucasian females.  (1 Aug. CT 9-188.)  In addition to the analysis of the

8  trial court's individual finding of no discriminatory intent as to the five minority jurors, the ultimate

9  racial make-up of Torres' jury belies any claim of racial discrimination in jury selection.  Moreover, a

10  consideration of the record of voir dire as a whole reveals no discriminatory intent on the part of the

11  prosecutor.

12          iii.    *Conclusion*

13        After careful consideration of the record and the applicable legal authorities, the Court finds

14  that Torres has failed to satisfy his burden under AEDPA to establish that the state court's denial of

15  this claim was based on an unreasonable determination of the facts in light of the evidence presented

16  in state court or involved an unreasonable application of *Batson* and its progeny.  *See* 28 U.S.C.

17  § 2254(d)(1)-(2); *Williams*, 529 U.S. at 412-13.  Accordingly, the Court **RECOMMENDS** that

18  federal habeas relief be **DENIED** as to Claim One of Torres' petition.

19        2.    *Insufficient Evidence Claim*

20        Torres also contends that he was denied his Fourteenth Amendment right to due process when

21  the jury convicted him of conspiracy to furnish a firearm to a felon.  (Pet. at 7; attachment A at 9-11.)

22  Specifically, Torres complains that: 1) there was no evidence to support the conviction apart from his

23  own admissions; (2) there was no evidence of an overt act; and (3) there was no evidence that his

24  alleged co-conspirator knew he was an ex-felon.  (*Id.*)  Respondent counters that the state court's

25  resolution of this claim was neither contrary to, nor an unreasonable application of, clearly

26  established Supreme Court law.  (Resp'ts Mem. of P. & A. in Supp. of Answer at 12-18.)

27        Torres raised this claim in the petition for review he filed in the California Supreme Court,

28  and that court denied the claim without reasoned decision.  (Lodgment No. 16.)  Accordingly, this

1   Court must "look through" to the California appellate court's denial of this claim for its analysis.

2   *Ylst*, 501 U.S. at 801-06.  That Court recounted the underlying facts surrounding this claim which are

3   supported by the record and to which this Court defers under 28 U.S.C. § 2254(e)(1):

4          [¶] In a recorded conversation on the morning of July 10, 2003, Torres told an
           individual named Richard Alvarado that Torres's family had been threatened.
5          Alvarado told Torres he could get him some guns, and Torres stated he needed some.
           Alvarado stated he could get the guns in about one hour.  Later during the day
6          Alvarado informed Torres that the delivery of the guns had been delayed.  At 9:55
           p.m., Alvarado told Torres he had a gun for Torres, and agreed to bring it to Torres.
7          Later, Alvarado told Torres he could not get a ride.  Torres stated he would go to
           where Alvarado was, and Alvarado gave Torres directions.  Torres asked what kind of
8          gun it was, and Alvarado stated it was "a .20-gauge, sawed off."  At 11:44 p.m., Torres
           told Alvarado that he was "on [his] way" and the two agreed to meet at a particular
9          taco shop.

10  (Opinion at *28.)

11         The state appellate court's analysis of the claim was as follows:

12         [¶] Torre's challenges to this conspiracy conviction based on the corpus delicti rule
           and on the absence of an overt act are unavailing.  The corpus delicti rule requires
13         proof that a crime actually occurred by evidence other than the defendant's own
           out-of-court statements.  ( People v. Herrera (2006) 136 Cal.App.4th 1191, 1200.) The
14         independent proof of the crime may be slight or minimal.  ( Ibid.)  Here, the
           conspiracy offense was supported by both Torres's and Alvarado's statements during
15         the recorded conversations.  Thus, the corpus delicti was shown independent of
           Torres's own statements.  To the extent Torres suggests the corpus delicti was not
16         established because there was no evidence he actually acquired a gun from Alvarado,
           the contention is unavailing.  Conspiracy is an " 'inchoate crime [that] does not require
17         commission of the substantive offense that is the object of the conspiracy.'" (People v.
           Morante, supra, 20 Cal.4th at pp. 416-417.)

18
           [¶] The overt act necessary for conspiracy culpability can be any outward act done to
19         pursue the crime and manifesting an intent to accomplish the crime.  ( People v. Von
           Villas, supra, 11 Cal.App.4th at pp. 243-244.)  Alvarado's statement that he had
20         obtained a gun for Torres was sufficient to show an overt act had been committed.

21         [*29][¶]  Finally, there is substantial evidence to support the knowledge element of the
           substantive offense of supplying a firearm to an ex-felon.  This offense is committed
22         when the defendant "knowingly" furnishes a firearm to an ex-felon (§ 12072, subd.
           (a)(1)) or furnishes a firearm with "cause to believe" (§ 12072, subd. (a)(2)) the
23         recipient is an ex-felon.  [FN17]  A violation of the "knowingly" provision is a felony
           punishable by a two-, three-, or four-year sentence (§ 12072, subd. (g)(2)(A)), whereas
24         a violation of the "cause to believe" provision is a "wobbler" punishable by a fine, jail
           sentence, or prison sentence (§ 12072, subd. (g)(3)(A)).  Here, the jury was instructed
25         solely under the "knowingly" prong of section 12072.  Accordingly, we shall evaluate
           the evidence under this prong.

26
           [FN17. Section 12072 states in relevant part: "(a)(1) No person, corporation, or firm
27         shall knowingly supply, deliver, sell, or give possession or control of a firearm to any
           person within any of the classes prohibited by Section 12021 or 12021.1 [ex-felons].
28         [¶] (2) No person, corporation, or dealer shall sell, supply, deliver, or give possession
           or control of a firearm to any person whom he or she has cause to believe to be within

any of the classes prohibited by Section 12021 or 12021.1 of this code...." (Italics added.)]

[¶] Preliminarily, we note we are not persuaded by the Attorney General's argument that a violation of section 12072, subdivision (a)(1) occurs when a person knowingly supplies a firearm, even without knowledge of the recipient's ex-felon status. This assertion is contrary to the plain language of section 12072, subdivisions (a)(1) and (a)(2), which differentiates between "knowingly" supplying a firearm to an ex-felon and supplying a firearm with "cause to believe" the person is an ex-felon. Further, the assertion is contrary to the general rule that, absent compelling evidence of a contrary legislative intent, "the prosecution [must] prove some form of guilty intent, knowledge, or criminal negligence" to support a criminal conviction. (In re Jorge M. (2000) 23 Cal.4th 866, 872, 879; In re Jennings (2004) 34 Cal.4th 254, 267.) The Attorney General's interpretation is also unsupported when the statute is viewed in its entirety. As stated, a violation of section 12072, subdivision (a)(1) is a felony, whereas a violation of section 12072, subdivision (a)(2) may be punished as a felony or a misdemeanor. It makes no sense that the harsher felony provision has no knowledge requirement at all regarding ex-felon status, whereas the more lenient "wobbler" provision does impose a knowledge (i.e., imputed knowledge) requirement. [FN18]

[FN18. We note that in People v. Snyder (1982) 32 Cal.3d 590, 592-593, the court held that a defendant's claim that she thought she was convicted of a misdemeanor, not a felony, was not a defense to a charge of possession of a firearm by an ex-felon. The court reasoned that the defendant's claim constituted a mistake of law, and the defendant was charged with knowledge that the offense she was convicted of was a felony. (Id. at p. 593.) There is nothing in Snyder which supports interpreting section 12072, subdivision (a) to dispense with the plainly-stated requirement that the defendant must have actual or imputed knowledge of the firearm recipient's ex-felon status.]

[¶] A conspiracy conviction requires that both "the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense...." (People v. Morante, supra, 20 Cal.4th at p. 416, italics added.) A person "'may not conspire with himself.'" (People v. Palmer, supra, 24 Cal.4th at p. 864 .) Thus, to sustain a conviction under count 14, the prosecution had to prove that both Torres and Alvarado knew Torres was an ex-felon.

[¶] Knowledge may be proven by circumstantial evidence. (In re Jorge M., supra, 23 Cal.4th at p. 884.) A prosecution witness testified that Alvarado was a National City gang member who worked for Torres. [FN19] Because a primary activity of a criminal street gang is to engage in felonious criminal activities, the jury could reasonably infer that gang members who associate with each other are aware when one of their associates is caught, prosecuted, and convicted of a felony. The jury could reasonably conclude that the nature of the association between Torres and Alvarado established that Alvarado was apprised that Torres had suffered a felony conviction.

[FN19. Although the record it not entirely clear, Alvarado may have been a member of the National City Locos gang, whereas Torres was a member of the Old Town National City gang.]

[*30] [¶] There is substantial evidence to support Torres's conviction of conspiracy to supply a firearm to an ex-felon.

1 (Opinion at * 28-30.)

2 //

3

4               a.      *Analysis*

5        The Fourteenth Amendment's Due Process Clause is violated "if it is found that upon the

6 evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a

7 reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979).  The evidence is to be considered

8 in the light most favorable to the prosecution.  *Jackson*, 443 U.S. at 319.  If the factual record

9 supports conflicting inferences, federal courts are to presume "that the trier of fact resolved any such

10 conflicts in favor of the prosecution," and must "defer to that resolution."  *Id*.; see also *Payne v. Borg*,

11 982 F.2d 335, 338 (9th Cir. 1992).  In deciding whether a due process violation has occurred, this

12 Court must look to "the substantive elements of the criminal offense as defined by state law."

13 *Jackson*, 443 U.S. at 324, n. 16.

14        Under California law, no agreement amounts to a conspiracy unless some act, beside the

15 agreement itself, is done to effect the object of the agreement.  Cal. Penal Code section 184.  A

16 conviction of conspiracy requires proof that the defendant and another person had the specific intent

17 to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that

18 offense, together with proof of the commission of an overt act "by one or more of the parties to such

19 agreement" in furtherance of the conspiracy.  *People v. Morante*, 20 Cal.4th 403 (1999).  Evidence is

20 sufficient to sustain a conviction of conspiracy if it supports an inference that the parties positively or

21 tacitly came to a mutual understanding to commit a crime.  Therefore, conspiracy may be proved

22 through circumstantial evidence inferred from the conduct, relationship, interests, and activities of the

23 alleged conspirators before and during the alleged conspiracy.  *People v. Prevost*, 60 Cal.App.4th

24 1382, 1399 (1998).  The rule in California is that a defendant cannot be convicted of a crime when

25 there is no proof a crime occurred other than the defendant's own earlier utterance indicating a

26 predisposition or purpose to commit it.  *People v. Alvarez*, 27 Cal. 4th 1161, 1164-65 (2002).

27        With regard to the overt act requirement, "[i]t is only necessary to prove one overt act."

28 *People v. Olson*, 232 Cal.App.2d 480, 489 (1965).  An overt act need amount to no more than an act

1   showing that the conspiracy has gone beyond the state of a mere meeting of the minds upon the

2   attainment of an unlawful object and that action between conspirators as such has begun.  *People v.*

3   *Sullivan*, 113 Cal.App.2d 510, 523-24 (1952).  The overt act requirement fulfills two purposes.

4   First, it provides an opportunity to repent, so that any of the conspirators may reconsider and abandon

5   the agreement before taking steps to further it, and thereby avoid punishment for the conspiracy."

6   *People v. Russo*, 25 Cal.4th 1124, 1131 (2001).  Second, it shows that "an indictable conspiracy

7   exits" because "evil thought alone cannot constitute a criminal offense."  *Id.*  A conversation may

8   constitute an overt act made in support of a conspiracy once the parties reach a meeting of the minds

9   about their intention to commit a crime.  *People v. Olf*, 195 Cal.App.2d 97, 108 (1961); *People v.*

10  *Shaw*, 115 Cal.App.2d 597, 601 (1953).

11          An independent review of the record of Torres' trial reveals that the state court's denial of his

12  claim was not contrary to, or an unreasonable application of, *Jackson* in light of California conspiracy

13  law.  At trial, the prosecution presented the following evidence that Torres was guilty of conspiracy

14  to furnish a felon with a firearm.

15          On July 10, 2003, Torres and Richard Alvarado discussed Alvarado providing Torres with

16  guns and money.[6/]  Torres said some people were after his family.  (23 RT 3976-79; 14 CT 3053 (". . .

17  I took my family somewhere else because some shit was coming down."))  Later that day, Torres left

18  a message mentioning guns.  (23 RT 3979-80; 14 CT 3057 (". . . He's got a couple of weapons for

19  us."))  A few minutes later, Alvarado told Torres his "homeboy" was bringing him guns.  (23 RT

20  3980-81; 14 CT 3059 (" . . . My homeboy come bring me couple of straps right now so ...".))

21  Approximately two hours later, Alvarado told Torres he was waiting for a ride to Torres' residence.

22  (23 RT 3981; 14 CT 3060 (. . . "I'm waiting for my homie dog.  I just hung up with him right now.

23  He's gonna come . . . drop me off."))  An hour after that, Alvarado called and said the guy was

24  "lagging," but he would be over with guns and money.  (23 RT 3982; 14 CT 3063 (. . . "Don't trip.  I

25  will go up there and I guarantee you'll have some straps today, dog, for sure.  He's just lagging."))

26  _____

27          [6]The transcriptions of the ten (10) recorded telephone conversations between Torres ("Nite
    Owl") and Alvarado ("Rick") on July 10, 2003 are found at 14 CT 3052-78.  Those recorded
28  conversations were played in court during questioning of the prosecution's witness, but were not
    transcribed as part of the Reporter's Transcript.  Thus, the two (the Clerk's Transcript and the Reporter's
    Transcript) must be read together to fully recreate the testimony and evidence presented at Torres' trial.

1   There were three more recorded calls between Alvarado and Torres.  Alvarado kept assuring Torres

2   he would provide the guns and money.  However, he had met with some delays.  (23 RT 3982-84; 14

3   CT 3065-71.)  Alvarado finally called and said he had a "20 gauge sawed off" shotgun.  (14 CT

4   3074.)  Alvarado gave Torres directions, and Torres confirmed that he understood.  (23 RT 3984-86;

5   14 CT 3074 (". . . Uhm, you get off on 24th and you go all the way up, pass Highland and then we

6   make a turn until we get to 20th through the back roads, you see what I'm saying?  And then we

7   make a left turn on 'F.'  Okay?  And then, where, where . . . ?  You're gonna be outside?".))

8   Afterwards, Alvarado called Torres, and it sounded as if Torres was in a car.  Alvarado suggested that

9   it might be easier to meet at a Taco Shop on 21st and Highland, and Torres stated "Okay.  I'll be

10  there."  (23 RT 3986-87; 14 CT 3077-78.)  It was stipulated that Torres had previously been

11  convicted of a felony.  (24 RT 4145.)

12       The evidence was sufficient to support Torres' conviction.  The evidence showed that Torres

13  had previously been convicted of a felony.  Torres and Richard Alvarado engaged in a series of

14  telephone conversations to discuss Alvarado providing Torres with guns and money.  In the fourth

15  call, Alvarado informed Torres that he had arranged to take delivery of guns from his "homeboy."  By

16  the conclusion of the forth call, a meeting of the minds existed between Torres and Alvarado that

17  Alvarado intended to obtain guns and supply at least one gun to Torres.  At that point, the plan for

18  Torres to pick up a gun and money from Alvarado was in place.  Each of the conversations thereafter

19  constituted an overt act in support of the already-formed conspiracy between Torres and Alvarado

20  because each of the conversations was designed to further the conspiracy.  *Sullivan*, 113 Cal.App.2d

21  at 523.

22       It could reasonably be inferred from the final recorded conversation that Torres picked up the

23  gun from Alvarado shortly after the conversation's end because Torres was in a car and getting final

24  meeting instructions from Alvarado.  Alvarado's statements during the ten (10) recorded

25  conversations leading up to the meeting and gun exchange were sufficient evidence of a crime under

26  California law because they constituted evidence beyond Torres' own confessions or extrajudicial

27  statements, and they constituted evidence of both the formed conspiracy and overt acts in furtherance

28  of that conspiracy.  Moreover, a rational trier of fact could reasonably have concluded that Alvarado

1    knew Torres was a felon because of Alvarado and Torres' status as members of the Mexican Mafia

2    (albeit with different gang affiliations) and the fact that Alvarado had previously worked for Torres,

3    who was a crew leader for the Mexican Mafia running a methamphetamine distribution operation.

4    Under California law, this is all that is required to establish conspiracy to furnish a felon with a

5    firearm.

6        While the evidence supporting Torres' conviction for conspiracy to furnish a felon with a

7    firearm was by no means overwhelming, the Court should find that it was sufficient under the

8    Constitution, especially in light of the deference afforded state court factual findings on collateral

9    review.  Viewing the evidence in the light most favorable to the prosecution, and resolving any

10    conflicting inferences in favor of the prosecution, a rational trier of fact could have found beyond a

11    reasonable doubt that Torres committed the crime.  *See Jackson v. Virginia*, 443 U.S. at 324.

12        b.     *Conclusion*

13        Torres has failed to establish that the appellate court erred when it denied his insufficient

14    evidence claim as to Count 14.  Accordingly, the state court's denial of this claim was neither

15    contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *See Early*,

16    537 U.S. at 8 (stating that "so long as neither the reasoning nor the result of the state-court decision

17    contradicts [Supreme Court precedent,]" the state court decision will not be contrary to clearly

18    established federal law).  Thus, the Court **RECOMMENDS** that federal habeas relief be **DENIED** as

19    to Claim Two of Torres' petition.

20        3.     *Improper Jury Instructions Claim*

21        Torres claims that his Fourteenth Amendment due process rights were violated when the trial

22    court failed to properly instruct the jury regarding accomplice testimony.  (Pet. at 8; attachment A at

23    11.)  Specifically, Torres contends that: (1) the trial court erred because its accomplice instructions

24    failed to identify Francisco Lopez and Sergio Pulido as accomplices in all of the offenses involving

25    victim Sanchez, and (2) the trial court erred because its cautionary accomplice instructions failed to

26    identify Gongora as an accomplice in the alleged conspiracy to kidnap Jauregui.  (*Id*.)  Respondent

27    contends the state court's denial of this claim was neither contrary to, nor an unreasonable application

28    of, clearly established Supreme Court law.  (Mem. of P. & A. in Supp. of Answer at. 19-25.)  The

1   Court will discuss these two instructional claims in turn.[7/]

2          a.   *Torres' claim that the trial court erred because its accomplice instructions*
               *failed to identify Francisco Lopez and Sergio Pulido as accomplices in all of*
3              *the offenses involving victim Sanchez*

4          Torres raised this claim in a petition for review filed in the California Supreme Court, and that

5   court denied it without a reasoned decision.  (Lodgment Nos. 14 and 16.)  Accordingly, this Court

6   must "look through" to the California appellate court's denial of the claim as the basis for its analysis.

7   *Ylst*, 501 U.S. at 801-06.  In its opinion, the state appellate court summarized the following facts,

8   which are supported by the record, with regard to Count 6 of the information, conspiracy to commit

9   extortion by Torres and co-defendant Contreras against Sanchez from June 4 through June 27, 2003:[8/]

10         [¶] Sanchez and Pulido were methamphetamine drug dealers.  As a result of their
           transactions, Sanchez owed money to Pulido.  Torres, who was providing protection to
11         Pulido, conspired with several individuals to collect money or drugs from Sanchez to
           pay off the Pulido debt.
12
           [¶] Pulido and Francisco [Lopez] testified at trial and provided evidence implicating
13         Torres in the offenses against Sanchez.  The June 4 offenses of kidnapping for
           robbery, assault by means of force likely to cause great bodily injury, extortion, and
14         robbery commenced at Pulido's residence and continued on at a residence shared by
           Jaime and Contreras.  Pulido testified that Torres and Jaime arrived at Pulido's
15         residence at about 3:00 p.m. on June 4 asking for Sanchez.  Pulido directed them to a
           bedroom where Sanchez was visiting him.  Francisco arrived at the residence shortly
16         after Torres and Jaime.  Francisco observed Sanchez in the bedroom, dressed only in
           his underwear, on his knees with his head against closet doors or a wall.  As Francisco
17         was leaving the bedroom, Jaime hit Sanchez.  Francisco stayed in the living room with
           Pulido, and Pulido left the residence about five minutes later.
18
           [¶] About 10 or 15 minutes later, Francisco saw Jaime and Torres walk with Sanchez
19         (now clothed) out of the residence.  Sanchez, Jaime, and Jaime's girlfriend left in
           Sanchez's car, and Torres left on foot.  Jaime's girlfriend was driving Sanchez's car,
20         and Jaime and Sanchez were sitting in the backseat.  Sanchez looked scared.

21         [¶] Thereafter, the police wiretap revealed that Sanchez was taken to Jaime's and
           Contreras's residence, where the assault and threats continued into the night of June 4.
22         [FN14]  During these recorded conversations, Torres revealed his intention not to
           return Sanchez's car to him.  In a recorded conversation between Torres and Jaime at
23

24         [7] To the extent that Torres' claims are based on errors in the interpretation or application of state
25   law, he is not entitled to federal habeas relief.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

26         [8]"Additionally, in counts 2 through 5, the information alleged that on June 4, 2003, Torres and
     Contreras committed five offenses against Sanchez; i.e., kidnapping for robbery, robbery, assault by
27   means of force likely to cause great bodily injury, and extortion.  After the presentation of the
     prosecution's case, the kidnapping for robbery and robbery offenses were dismissed as to Contreras
28   based on insufficient evidence. The jury convicted Contreras of conspiracy to commit extortion, but
     acquitted him of the June 4 assault and extortion charges.  Torres was convicted of all the charged
     offenses related to Sanchez." (Opinion at *18.)

6:06 p.m. on June 4, Jaime reported that he had Sanchez with him and that Sanchez was trying to get drugs from "his people" to pay the debt.  Torres instructed Jaime to tell Sanchez that he better come up with some money, or he was not going anywhere and was not going to live.  During this same conversation, Torres told Jaime that he had promised Sanchez's car to the Señor.  During a 7:49 p.m. conversation, Jaime told Torres that he had beaten Sanchez up, and told Sanchez that he had to pay "[e]verything right now, tonight, or else...."  At 8:28 p.m., Jaime reported that Sanchez asked to be let go for a day so he could get what was needed to pay them, and that Jaime told Sanchez the next time he saw him he would "see no more."  Torres told Jaime to tell Sanchez that "he better not report that car either."  Torres instructed Jaime to do what he thought was right, and that Jaime could consider if he thought Sanchez was "going to come through."

[FN14. In many of the recorded conversations discussing the events of June 4 and thereafter, Sanchez was not identified by name.  However, from a review of all the phone calls and other information it is apparent that the person being discussed was Sanchez.]

[*20] [¶] The wiretap revealed that Contreras was also at his residence while Sanchez was being held captive there.  At 9:02 p.m. on June 4, Contreras called Torres and told him that he was "[r]ight here when the shit happened."  Torres asked what was happening right then; Contreras responded "we're talking to him right now and shit ... I think we're having a little chat."  Torres told Contreras to tell Jaime to call Torres in a few minutes because if they needed to move Sanchez to another place, it was ready.

[¶] At 12:24 a.m. on June 5, Jaime called Torres and reported "it's done"; that Sanchez was going to report in tomorrow; and that Jaime would call Torres the next day.  Subsequent recorded conversations revealed that Sanchez had been freed by Jaime and that Torres was monitoring the situation to ensure that Sanchez adhered to his promise to pay the debt.  From June 5 through June 27, there were numerous phone calls between Torres and other individuals discussing the ongoing attempts to get money or drugs from Sanchez to pay off the debt, as well as Torres's anger at Sanchez and his intent to assault him and/or take his property.  Francisco and Pulido were frequent participants in the recorded conversations.

[¶] Following Sanchez's release, Contreras was involved in three conversations with Torres in which Sanchez was discussed.  During a conversation on June 7, Contreras asked Torres, "[w]hat's up with [Sanchez]?"  Torres responded that he was waiting for Jaime to reach Sanchez and then report to Torres.  Contreras asked whether Sanchez had "come through."  Torres stated no, and that he was getting upset and was "gonna go over there and fucking kill that mother fucker [Sanchez]."

[¶] On June 8, after Torres had discovered that Sanchez had lied to him about his assets, Torres told Contreras that he needed to talk to Jaime because there was a problem with Sanchez that Torres needed to handle "personally."  Contreras stated that he thought another individual (apparently referring to Jaime) was going to handle it. Torres stated, "No.... He lied to me and you know how I feel about fucking liars. [¶] ... [¶] I fucking found out some shit, homie.  And I confirmed it, and now he's going to be mine."  In response to this disclosure, Contreras called Sanchez a "motherfucker," and stated, "What the heck is this guy's problem, man?"  Torres told Contreras he could not say what he was planning to do over the phone, and Contreras responded "Yes" and "Uh-huh."  Torres continued, "But, this guy ... you think he got fucking hurt last time," and then laughed.  Contreras stated, "Man ... seriously?"  Torres answered, "Seriously, homie."  Torres asked Contreras to find Jaime for him so he could talk to him about this matter, and Contreras agreed he would do so.

[¶] On June 9, Contreras called Torres and asked if anything had happened. Torres responded that he knew where Sanchez was staying. Contreras inquired, "[I]f he's hiding out, though[,][w]hat makes you think he gots anything?" Torres stated he had confirmed that Sanchez had money and was "moving some shit right now." Torres assured Contreras that he was "gonna be in there, don't worry."

(Opinion at *18-20.)

In its analysis of the claim, the state appellate court, citing California law, wrote:

[¶] The trial court gave the jurors the cautionary instructions applicable to accomplices, informing them that accomplice testimony should be viewed with caution, that it must be corroborated, and that one accomplice's testimony may not be corroborated by another accomplice's testimony. The court instructed the jury that Pulido was an accomplice as a matter of law for the count 6 offense of conspiracy to commit extortion against Sanchez. Torres contends the trial court should have also instructed the jury that Pulido was, or could be found by the jury to be, an accomplice for the June 4 offenses against Sanchez alleged in counts 2 through 5 (kidnapping for robbery, assault, extortion, and robbery).

[¶] The court instructed the jury that Francisco was an accomplice as a matter of law for various counts unrelated to the Sanchez count. However, Francisco was not identified as an accomplice for the counts related to victim Sanchez. Torres asserts this was error.

[¶] We agree the trial court should have given accomplice instructions for Pulido and Francisco for all the counts related to victim Sanchez. If the evidence is sufficient to support a conclusion that a witness implicating the defendant was an accomplice, the trial court must sua sponte instruct the jury to determine whether the witness was an accomplice and give the cautionary accomplice instructions. ( People v. Zapien (1993) 4 Cal.4th 929, 982.) The jury could have found that Pulido and Francisco were accomplices in the offenses committed against Sanchez on June 4, including the assault at Pulido's residence, the kidnapping for robbery, the robbery of his vehicle, and the extortion.

[¶] Both Pulido and Francisco were at Pulido's residence when Sanchez was first assaulted by Jaime. Sanchez was being assaulted for a debt he owed Pulido. From this fact the jury could infer that Pulido participated as an aider and abettor, for example by arranging for the encounter at his residence to give Jaime an opportunity to assault, kidnap, extort, and rob Sanchez. The jury could have also concluded that Francisco was an aider and abettor based on the facts that Francisco was present at Pulido's residence when the offenses occurred, and (as we will discuss shortly) during the ensuing weeks there were repeated discussions between Torres and Francisco about the efforts to get money or property from Sanchez. Because Francisco was involved in the efforts to obtain money or property from Sanchez after June 4, the jury could reasonably infer that he was likewise an aider and abettor while at Pulido's residence on June 4.

[¶] The jury could also find that Francisco participated in the conspiracy to commit the extortion. In a June 5 conversation, Francisco reported to Torres that Sanchez had called him and stated he wanted to pay off the debt with drugs. Francisco agreed to call Pulido for Torres to check whether Pulido would accept drugs instead of cash. Francisco had additional conversations with Torres about collecting the debt from Sanchez on June 5, 8, and 9. On June 10, Francisco met with Sanchez and acquired methamphetamine from him; Francisco then delivered the drugs to Torres. Torres tested the drugs and discovered they were not good quality. When Torres angrily

informed Francisco of this, Francisco agreed that Sanchez "keeps messing around" and "that's why he's got coming what he's got coming." Subsequently, Francisco assisted Torres in efforts to try to reach Sanchez. On June 27, Francisco reported to Torres that Sanchez's telephone had been disconnected and promised that he would try to find Sanchez. This evidence provided a sufficient basis for a jury finding that Francisco was an accomplice in the extortion conspiracy.

[*23] [¶] However, the failure to identify Pulido and Francisco as accomplices for all the Sanchez offenses does not require reversal. Because an accomplice may tend to shift blame to the defendant, the accomplice instructions inform the jury that an accomplice's testimony should be viewed with caution and must be corroborated by evidence, independent of the accomplice's testimony, that tends to connect the defendant with the commission of the crime. ( People v.. Howard, supra, 42 Cal.4th at p. 1022; People v. Zapien, supra, 4 Cal.4th at p. 982.) The failure to give accomplice instructions is harmless if there is sufficient corroborating evidence in the record. (People v. Zapien, supra, 4 Cal.4th at p. 982.) Corroborating evidence may be slight, may be entitled to little consideration when standing alone, and need not establish all the elements of the crime. ( Ibid.)

[¶] Torres's connection to the charged offenses against Sanchez was amply corroborated by the recorded phone conversations with Torres obtained from the police wiretap. These conversations contained repeated admissions by Torres reflecting his intention that Sanchez be beaten and threatened, his plans to keep Sanchez's car, and his continued efforts to get money or property from Sanchez.

[¶] *Other Instructions*

[¶] To support his contention of reversible error, Torres asserts the trial court compounded the error arising from the incomplete accomplice instructions by instructing the jury with CALJIC Nos. 2.11.5 and 2.27. CALJIC No. 2.11.5 admonished the jury not to speculate why other persons who may have been involved in the crimes were not being prosecuted in this trial, and that the jury's sole duty was to decide whether the People had proven the guilt of each defendant on trial. Torres asserts the instruction should not have been given because Francisco, Pulido, and a third accomplice (Julio Navarette) testified for the prosecution in exchange for lenient deals.

[¶] In *People v Carrera* (1989) 49 Cal.3d 291, 312-313, the court held that a former version of CALJIC No. 2.11.5 should not be given when a prosecution witness has been afforded leniency, because the jury may be misled to believe that it was precluded from considering whether the witness had a strong incentive to tesify favorably to the prosecution. However, the *Carrera* court concluded the "potential for such a misunderstanding of the instructions as a whole, and that it may consider the existence of a bias, interest, or other motive when evaluating credibility. (See CALJIC Nos. 1.01, 2.20; *People v. Carrera, supra,* 49 Cal.3d at p. 313; see also *People v. Lawley* (2002) 27 Cal.4th 102, 162-163; *People v. Fonseca* (2003) 105 Cal.App.4th 543, 547-550.)

[¶] Here, as in *Carrera*, the jury was instructed in the language of CALJIC Nos. 1.01 and 2.20. Based on these instructions, and as a matter of common sense, we are confident the jury understood it could consider the lenient deals provided by the prosecution when evaluating the accomplices' credibility. Any error arising from giving CALJIC No. 2.11.5 does not warrant reversal, even when considered in light of the failure to fully specify all the counts for which Francisco and Pulido could have been found to be accomplices.

[¶] CALJIC No. 2.27 told the jury that it should give uncorroborated testimony of a single witness whatever weight the jury though it deserved, and testimony concerning any fact by one witness who did not require corroboration was sufficient to prove that fact.  As stated, the police wiretap contained repeated admission from Torres clearly tying him to the Sanchez counts.  Thus, the jury would certainly have found corroboration for these counts if it had been instructed that such corroboration was necessary in order to rely on Francisco's and Pulido's testimony.  Once this corroboration was found to exist, the jury could properly rely on a single accomplice's testimony to establish a fact.  Under these circumstances we find no reversible error arising from the incomplete accomplice instructions even when considered in light of CALJIC No. 2.27. [FN15]

[[¶] FN15.  As we will discuss below in section V(B), the trial court also erred in failing to instruct the jury regarding codefendant Gongora's status as an accomplice in count 15 (conspiracy to kidnap Jauregui), but we find the error harmless based on sufficient corroborating evidence.  We likewise find no prejudice arising from the giving of CALJIC Nos. 2.11.5 and 2.27 as it pertains to Gongora.]

(Opinion at *22-24.)

        To warrant habeas relief in a jury instruction context, there must be a reasonable likelihood that the jury applied the instruction(s) in a way that violated the Constitution.  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  Under California law, if evidence corroborates an accomplice's testimony, error in failing to give adequate accomplice instructions is harmless.  *People v. Verlinde*, 100 Cal.App.4th 1146, 1163 (2002).  The court in *Verlinde* stated:

        The corroborative evidence 'must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but it is not necessary that the corroborative evidence be sufficient in itself to establish every element of the offense charged." [Citations omitted.]'" The evidence necessary to corroborate accomplice testimony need only be slight, such that it would be entitled to little consideration if standing alone. [Citation omitted.] It is enough that the corroborative evidence tends to connect defendant with the crime in a way that may reasonably satisfy a jury that the accomplice is telling the truth. [Citation omitted.] Corroborative evidence may be entirely circumstantial. [Citation omitted]. *Id.*

        There is no reasonable likelihood that the jury applied the instructions in a way that denied Torres due process.  The record reflects that evidence other than the testimony of Lopez and Pulido tended to corroborate that Torres participated in kidnaping for robbery, robbery, assault by means of force likely to cause great bodily injury, extortion, and conspiracy to commit extortion, all against victim Sanchez.  As the Court of Appeal concluded, Torres' connection to the charged offenses was amply corroborated by the recorded telephone conversations obtained from the wiretaps.  (*See* 10 CT 2090 - 11 CT 2370.)  Specifically, Torres (identified by his street name "Nite Owl" in the transcripts of the recorded conversations), participated in more than fifty (50) conversations between June 4,

1  2003 and June 28, 2003 pertaining to the crimes committed against victim Sanchez.  (*Id*.)  For

2  example, after some discussions with associates about obtaining payment from Sanchez, Torres stated

3  in a call "Well, then . . . tell [Sanchez] if [he] wants to . . . live, he better . . . come up with something

4  or I'm gonna go . . . put him away right now."  (10 CT 2094.)  Later, Jaime Lopez stated "I had to do

5  some Chinese torture on the guy . . . and . . . he's a little more serious now;" to which Torres replied

6  "Okay."  (10 CT 2095.)  A few days later, while discussing a new arrangement for payment by

7  Sanchez, Torres stated "and give that son of a bitch a good beating."  (10 CT 2163.)

8        Additional evidence presented at trial further showed that Sanchez went to the hospital and

9  had wounds that required attention within a couple of hours of Torres' co-defendant Contreras

10  "having a little chat" with Sanchez.  (9 RT 1273-1306; 10 CT 2106.)  The E.R. doctor testified that

11  Sanchez "looked very distressed, and, frankly, . . . petrified" when he arrived at the hospital.  (9 RT

12  1279.)  Sanchez had sustained blunt trauma to the right side of his face, including a laceration that

13  required stitches.  (9 RT 1282-84.)  Sanchez's mother corroborated this evidence when she testified

14  that she saw Sanchez with blood on his face, a swollen eye, and bruises on his face, shoulders and

15  back.  Sanchez asked his mother for $5,000.  He told her he needed the money or something might

16  happen to him.  (19 RT 3041-46.)

17        Although such evidence was circumstantial, this was amply sufficient for corroboration

18  purposes under California law.  *Verlinde*, 100 Cal.App.4th at 1163.  Coupled with this corroborating

19  evidence is the fact that the jury was already instructed that Lopez was an accomplice as a matter of

20  law on Counts 1, 8, and 9, and Pulido was an accomplice as a matter of law on Counts 1 and 6.  (1 CT

21  147.)  Thus, there is no reasonable likelihood that the jury applied the instructions in a way that

22  denied Torres due process.

23        Torres has failed to cite any clearly established Supreme Court law requiring particular jury

24  instructions in cases where accomplice testimony is in evidence, and he has failed to establish that the

25  state appellate court erred when it denied his jury instruction claim as to Counts 2-6.  Accordingly,

26  the state court's denial of this claim was neither contrary to, nor an unreasonable application of,

27  clearly established Supreme Court law.  *See Early*, 537 U.S. at 8 (stating that "so long as neither the

28  reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" the state

1    court decision will not be contrary to clearly established federal law).  Thus, the Court

2    **RECOMMENDS** that federal habeas relief be **DENIED** as to this part of Claim Three of Torres'

3    petition.  *Williams*, 529 U.S. at 412-13.

4

5              b.    *Torres' claim that the trial court erred because its cautionary accomplice*
                     *instructions failed to identify Gongora as an accomplice in the alleged*
6                    *conspiracy to kidnap Jauregui*

7          Torres raised this claim in a petition for review filed in the California Supreme Court, and the

8    California Supreme Court denied it without a reasoned decision.  (Lodgment Nos. 14 and 16.)

9    Accordingly, this Court must "look through" to the California appellate court's denial of the claim as

10   the basis for its analysis.  *Ylst*, 501 U.S. at 801-06.   In its opinion, the state appellate court

11   summarized the following facts in its discussion of codefendant Gongora's claim that insufficient

12   evidence was presented to convict him of Count 15, conspiring to kidnap Jauregui.  These same facts

13   pertain to Torres' jury instruction claim:

14         [¶] The police wiretap revealed that in August 2003 Torres believed Jauregui was
           planning to have Torres killed. [FN16]  On August 3, Torres repeatedly left messages
15         on Jauregui's phone stating that Jauregui should come and meet him if he had the
           "balls."  The wiretap revealed that Torres was arranging for several individuals to get
16         Jauregui and "put him somewhere where [Torres] want[ed] him."  On August 3,
           Torres and his coconspirators formulated a plan to grab Jauregui when he arrived at a
17         location near a trolley station.  Jauregui never showed up.  On August 4, Torres and
           his cohorts decided to get Jauregui when he got off work.  On that same day, the
18         police notified Jauregui that he was in danger.

19         [FN16.  As with other wiretap recordings, the conversations did not always identify
           Jauregui by name, but his identity was apparent from the context of the conversations
20         and other information.]

21         [¶] The recorded conversations revealed that on August 3, Torres told Gongora about
           the threat to his life.  On that same day, Gongora assisted Torres in an assault on
22         another individual whom they believed was also involved in the plot to kill Torres.
           Thereafter, Gongora participated in two specific discussions regarding the plans to
23         kidnap Jauregui.  In an August 4 conversation at 6:28 a.m., Torres told Gongora to
           "[g]et your ass over here 'cause these guys are gonna take care of [Jauregui] over that
24         at his work."  Gongora responded, "All right, I'll be over there."  In a recorded
           conversation about two hours later, Torres asked Gongora what time he wanted "this
25         to happen."  Gongora responded the best time to "get on him" was when he
           (Juauregui) got off work.

26
           [¶] The record supports that Gongora understood and agreed that the plan was to
27         kidnap Jauregui.  The recorded conversations between Torres and other coconspirators
           (apart from Gongora) regarding Jauregui contain statements that the men were going
28         to "take the . . . dude with them"; "put him somewhere where [Torres] want[s] him";
           "take him somewhere"; "pick up this bastard and . . . take him over there"; "take him

1  away"; take his ass"; and "snatch him." These statements support that the plan was to
   seize and transport Jauregui to a location where Torres could confront him. Based on
2  the August 4 communication between Gongora and Torres in which Torres asked
   Gongora what time he wanted the event to occur and Gongora responded the best time
3  to "get on" Jauregui was when he got off work, the jury could reasonably infer that
   Gongora was aware of and in accord with these kidnapping plans.

4

5  (Opinion at *27.)

6       Later in its opinion, the Court of Appeal analyzed the trial court's failure to instruct that

7  Gongora was an accomplice in the Jauregui conspiracy count, as referenced in FN15:

8       [¶] When giving cautionary instructions pertaining to testimony from an accomplice,
        the trial court did not identify Gongora as an accomplice in the count charging Torres
9       with Conspiracy to kidnap Jauregui. Torres contends this was error.

10      [¶] Gongora testified at trial. In his testimony, Gongora acknowledged that Torres was
        afraid because someone was threatening his life and that Torres and he had a phone
11      conversation during which they discussed "get[ting] [Jauregui] after he gets off work."
        On appeal, the Attorney General agrees the trial court should have instructed that
12      Gongora was an accomplice in the Jauregui count, but asserts the instructional error
        was harmless.
13
        [¶] [*28] As noted, the failure to give accomplice instruction is harmless if there is
14      sufficient corroborating evidence in the record, and the corroborating evidence may be
        slight. (*People v. Zapien, supra*, 4 Cal.4th at p. 982.) The recorded phone
15      conversations contain repeated admissions to Torres showing his involvement in the
        conspiracy to kidnap Jauregui. Because Gongora's testimony regarding this count was
16      corroborated by Torres's own admissions, the instructional error was harmless.

17 (Opinion at *27-28.)

18      The record reveals that the Court of Appeal was correct in finding that the instructional error

19 was harmless, and there is no reasonable likelihood that the jury applied the instructions so as to

20 violate Torres' right to due process. As the Court of Appeal concluded, Torres' connection to the

21 kidnaping of Jauregui was amply corroborated by the recorded telephone conversations obtained

22 from the wiretaps. After the beating of a person at the trolley station, intercepted telephone calls

23 showed Torres calling Monie and saying "We just got one of them. We got him right there in the

24 trolley station. The other one his name is Richard, Urie, Urigi, Uriege and he's from Shelltown.

25 He's the one that's supposed to be paying these people to come and do this." (12 CT 2667.) Other

26 recorded phone calls referenced "the guy" and trying to find "the guy." (17 RT 2792-93; 12 CT

27 2629-51.) Later, there were calls referencing beating "the shit out of him" at the trolley. Torres said

28 he and Gongora punched the guy." (17 RT 2808-13; 12 CT 2652-64.) Torres told Monie the guy

1 they were looking for was Richard Jauregui and was from ShellTown.  Torres left messages on

2 Jauregui's phone taunting him.  (17 RT 2815, 2830; 18 RT 2850; 12 CT 2665-66, 2684-85, 2687-88.)

3 Torres spoke to Jose Jaime "Speedy" Gutierrez about some hidden weapons.  Speedy apologized to

4 Torres for not getting an admission out of the guy after beating him .  (17 RT 2821-25; 12 CT 2672-

5 74.)  Police confirmed that Torres had been calling Jauregui.  (18 RT 2850-51.)

6       Although such evidence was circumstantial, this was amply sufficient for corroboration

7 purposes under California law in light of the trial court's failure to instruct the jury that Gongora's

8 accomplice testimony should be viewed with caution.  Coupled with this corroboration is the fact that

9 the jury was already instructed that Lopez was an accomplice as a matter of law on Counts 1, 8, and

10 9, Pulido was an accomplice as a matter of law on Counts 1 and 6, and Navarette was an accomplice

11 as a matter of law on Counts 1 and 7.  (1 CT 147.)  Given the corroboration of Gongora's accomplice

12 testimony and the fact that the jury had been given cautionary instructions as to other accomplice

13 witnesses, there is no reasonable likelihood that the jury applied the instructions so as to violate

14 Torres' right to due process.  *Estelle v. McGuire*, 502 U.S. at 72.

15       Torres has failed to cite any clearly established Supreme Court law requiring particular jury

16 instructions in cases where accomplice testimony is in evidence, and he has failed to establish that the

17 appellate court erred when it denied his jury instruction claim as to Count 15.  Accordingly, the state

18 court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly

19 established Supreme Court law.  *See Early*, 537 U.S. at 8 (stating that "so long as neither the

20 reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" the state

21 court decision will not be contrary to clearly established federal law).  Thus, the Court

22 **RECOMMENDS** that federal habeas relief be **DENIED** as to this part of Claim Three of Torres'

23 petition.  *Williams*, 529 U.S. at 412-13.

24 **V.**      **CONCLUSION AND RECOMMENDATION**

25       The Court submits this Report and Recommendation to United States District Judge Irma E.

26 Gonzalez under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court

27 for the Southern District of California. For the reasons outlined above, **IT IS HEREBY**

28 **RECOMMENDED** that the Court issue an Order:  (1) approving and adopting this Report and

Recommendation, and (2) directing that Judgment be entered denying the Petition.

**IT IS ORDERED** that no later than **August 16, 2010**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **August 30, 2010**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

DATED: July 15, 2010

Hon. William V. Gallo
U.S. Magistrate Judge